*In re* PETITION BY THE CITY OF EAST PEORIA FOR A SPECIAL ASSESSMENT FOR "EAST PEORIA WATERWORKS IMPROVEMENT PROJECT 78—B."—(THE CITY OF EAST PEORIA, Plaintiff-Appellee, *v.* BOARD OF TRUSTEES OF COMMUNITY COLLEGE DISTRICT NO. 514, Defendant-Appellant.)

Third District   No. 81-83

Opinion filed March 24, 1982.

Daniel M. Harrod, of Harrod Law Firm, P. C., of Eureka, for appellant.

Carl F. Reardon, of Moehle, Reardon, Smith & Day, Ltd., of East Peoria, for appellee.

JUSTICE TRAPP delivered the opinion of the court:

The Board of Trustees of Community College District No. 514 (objector) appeals from an order confirming an assessment against it for a new water tower and necessary appurtenances. Objector argues there is a contract between it and the city which precludes any assessment for

water improvements, asserts the commissioners did not comply with the statutory requirement that they report proportionate benefits for each property affected and contends its property will not be benefited to the amount assessed against it.

On September 18, 1979, the city of East Peoria filed a petition to begin steps to levy a special assessment for local improvements. Attached as exhibit A was ordinance No. 1455, which provided for a local water improvement project. Attached as exhibit B was an assessment role which listed the individual assessment against each property affected, including objector's campus.

An objection was filed by the college board of trustees alleging that a prior ordinance and "agreement" between the college and city provided that the city would supply water services to the college in perpetuity; the "agreement" constitutes a complete bar to the authority of the city to assess the college district; and objecting to the entry of any order of confirmation of said assessment role. Attached to the objection was a copy of a resolution passed by the city council of East Peoria, Illinois, on March 4, 1969, authorizing an agreement between the city and the college district providing for water service. Also attached was a copy of the "agreement" itself.

Following an amended petition revising figures in the assessment role, and other revisions in the assessment role, hearings were held on the objection by the college. On October 24, 1980, a judgment order of confirmation as to assessments levied against the college was filed stating that none of the objections filed by the objector have merit and, therefore, denying the objections. Subsequently, further revisions in the assessment role were made, none affecting the interest of the college district. The final relevant figures in the confirmed assessment role are as follows:

| | |
|---|---|
| Assessment for Junior College District 514 | $62,550.00 |
| Assessment for public benefit | $328,800.03 |
| Assessment against all property owners | $369,232.97 |
| Total Assessment against public benefit and all property owners | $698,033.00 |

This appeal followed.

The initial question addressed by the parties is whether the "agreement" provides for perpetual water service so as to preclude the city from assessing the college for present improvements, and if so, whether such a perpetual contract is void thus allowing the city to make the challenged assessment. An examination of the "agreement" discloses that the "in perpetuity" claim of objector could be deemed self-limited to the proposed construction then contemplated by reason of its several references to the construction of the water system and tanks "as proposed by City"; construction to be as "set forth on the plat hereto attached and

made a part hereof"; to maintain "Said water mains, water lines, * * * and elevated water tanks," and to liability for costs of "said facilities." Whatever the meaning of the words "in perpetuity" as used in the "agreement," it appears that the "agreement" was limited to work defined in the specifications attached to the "agreement." However, it does not appear that the instrument was argued in the trial court upon such language.

A city had no power to enter into a contract concerning the subject matter for a period longer than one year. Section 8—1—7 of the Illinois Municipal Code (Ill. Rev. Stat. 1979, ch. 24, par. 8—1—7) provides:

> "No contract shall be made by the corporate authorities * * * and no expense shall be incurred * * * unless an appropriation has been previously made concerning that contract or expense."

Section 8—2—9 requires municipalities with less than 500,000 inhabitants to pass an annual appropriation ordinance in which all purposes and objects shall be specified for each amount appropriated.

■■ In *Avery v. City of Chicago* (1931), 345 Ill. 640, 178 N.E. 351, our supreme court construed the statutory predecessors to these sections and held that "in the absence of an enabling statute authorizing a contract concerning the subject matter for a period longer than one year, the city of Chicago had no power to enter into such a contract imposing an obligation for five years." (345 Ill. 640, 648, 178 N.E. 351, 354.) A party contracting with a city is presumed to know whether the city is prohibited from making a contract, and a contract in violation of a statute is void and cannot be ratified. *DeKam v. City of Streator* (1925), 316 Ill. 123, 146 N.E. 550.

■■ Objector asserts this argument was not made at the trial court and cannot now be raised for the first time. However, the city's trial memorandum in opposition to the objection contains precisely the same argument. While there is no indication the argument was made orally, the memorandum filed with the circuit court suffices to preserve the issue. We conclude the contract provides for water service to the college at regular gallonage rates in perpetuity and that such contract is void and could not be ratified.

■■ Nonetheless, non-home-rule units of local government have only the powers granted to them by law and certain other specific powers not at issue here. (*Queenwood East Sheltered Care Home, Ltd. v. Village of Morton* (1981), 94 Ill. App. 3d 51, 418 N.E.2d 472; Ill. Const. 1970, art. VII, §7.) The only implied powers which a municipal corporation can possess and exercise are those which are necessarily incident to powers expressly granted. We have not been cited to, nor are we aware of, any power which would implicitly authorize this contract. To the contrary, we believe it is implicitly prohibited.

In essence, the contract attempted to bargain away the city's right and duty to assess objector for future assessments in exchange for the college's acceptance of a $150,000 assessment for the previous improvement. Such a contract contravenes the mandates of the special assessment commissioners to apportion the total cost of the improvement between the city and public according to respective benefits, and to apportion the total cost to the public between the parcels of land benefited, no assessment to exceed the amount of benefit. (Ill. Rev. Stat. 1979, ch. 24, par. 9—2—45.) If in fact the college is benefited by any specific improvement, removing it from the equation puts an impermissible burden upon other property owners. Therefore, the contract was entered into not only without implied authority, but with an implicit prohibition for such acts.

Objector argues that the commissioners did not "estimate what proportion of the total cost of such improvement will be of benefit to the public, and what proportion thereof will be of benefit to the property to be benefited," and did not "apportion the total cost between the municipality and that property, so that each will bear its relative equitable proportion." (Ill. Rev. Stat. 1979, ch. 24, par. 9—2—45.) This contention has no merit. The record is replete with assessment roles and amended roles showing how much each property was to be assessed, showing the sum of the assessments against all properties, and showing the assessments against the city. The fact that the commissioners nowhere say explicitly that each property will be benefited to the amount assessed, and that each assessment is proportionate to the total assessment costs, does not overcome the fact that the rolls do report the estimated proportionate benefit in terms of proportionate costs.

■■ Objector also challenges the amount of the assessment because the commissioners' only basis for the assessment of the college was a flat sum per acre. The commissioners did not consider the actual water usage of the college and could only say the college was benefited to the extent assessed. However, a per acre basis of assessment is not improper if made with regard to benefits. *Ownby v. City of Mattoon* (1923), 306 Ill. 552, 138 N.E. 110; *City of Monticello v. LeCrone* (1953), 414 Ill. 550, 111 N.E.2d 338.

The city here asserts that the protection against fire or other catastrophe was a proper benefit to be considered and assessed on a per acre basis. The city attempted to prove that the college was afforded extra fire protection by the improvement. The ordinance authorized the installation of a 750,000-gallon elevated water storage tank to improve and increase the municipal water service already provided by a 500,000-gallon water storage tank.

The city introduced the testimony of Daniel Giebelhausen, the

superintendent of waterworks for East Peoria. He testified that although the existing 500,000-gallon storage tank had never been shut down for maintenance or repairs, the policy of the Waterworks Department was to shut down tanks after 8 to 12 years for complete restoration. The Department had specific plans for taking the previously existing 500,000 gallon tank out of service as soon as the new one was in service. Without the new tank, service during the shutdown of the old tank would be supplied through other means. However, the alternative means would not supply the same amount of water and water pressure to the college, and Giebelhausen did not consider the alternative means an adequate substitute for the new tower.

More specifically addressing the additional fire protection supplied by the new tower, Giebelhausen testified that the 500,000-gallon tank contained 500,000 gallons of water approximately 60% of the time. The Waterworks Department attempts to maintain a 75% to 90% capacity and accomplishes it approximately 60% of the time. The tank does get down to the 100,000-gallon level at times. The city then introduced testimony of the fire chief and assistant fire chief of East Peoria who gave the conservative estimates that it would take approximately 350,000 to 360,000 gallons of water to fight a major fire. With regard to the college campus, the fire chief testified that a major fire would be one involving a large extent of the campus and necessitating fire hydrants. He did not believe alternative methods of supplying the water suggested by objector would be effective.

■■ The city asserts that the protection against fire or other catastrophe provided by the new water tank is a proper benefit to be considered and assessed on a per-acre basis. Objector asserts that evidence of a benefit based on future and conjectural plans is too speculative and doubtful to predicate a benefit upon. (*City of East St. Louis v. Illinois Central R.R. Co.* (1909), 238 Ill. 296, 87 N.E. 407.) It argues that evidence concerning any benefit from extra fire or hazard protection was too speculative, because there was no evidence the old water tank would, in fact, be taken out of service for maintenance, or that there would, in fact, be a fire at the college. It reasonably appears that a catastrophic fire at any point on the water system would affect the service to the college through depletion of the water supply.

We disagree with objector. The basic supposition that a fire may occur is not too conjectural. Increased fire protection has been held to be a proper element of benefit. (*Village of Northbrook v. Steerup* (1959), 16 Ill. 2d 530, 158 N.E.2d 630.) The supervisor of Waterworks for East Peoria testified that there were specific plans to take the old tank out of service for repairs. This is not too conjectural.

However, objector challenges the assessment on the further ground that the college is special-use property, but it was not assessed or

appraised as special-use property. It is uncontroverted that the property of the college is restricted by statute to its particular use and cannot legally be applied to any other use. In *City of Chicago v. Farwell* (1918), 286 Ill. 415, 121 N.E. 795, it was pointed out that where property is restricted to a special use, value is not the framework for establishing benefit. (See also *Forest Preserve District v. Lehmann Estate* (1944), 388 Ill. 416, 58 N.E.2d 538.) The true measure of the benefit which an improvement will confer upon such property is the increased value for that restricted use. (*Hinsdale Sanitary District v. Hinsdale Golf Club* (1936), 363 Ill. 595, 2 N.E.2d 921.) In *City of Chicago v. Chicago City Ry. Co.* (1922), 302 Ill. 57, 134 N.E.2d 44, it was determined that an assessment for special use property was restricted to benefit for such special use, and that it was error to admit evidence framed as value before and value after the improvement. See also *City of Chicago v. Chicago City Ry. Co.* (1923), 309 Ill. 448, 141 N.E. 141.

Objector argues that the appraisal of Heilman, for the city, was based upon the fair market value of the property rather than as special-use property and, therefore, Heilman's testimony is incompetent and inadmissible. (*City of Chicago v. Chicago City Ry. Co.* (1922), 302 Ill. 57, 134 N.E. 44.) A review of the record reveals that Heilman stated he was aware the property was special-use property, and he appraised it as such. However, he also stated that he appraised it at its fair market value, that is, its highest and best use. Therefore, it is unclear from an objective reading of the record what basis Heilman used to appraise the property. Since we are unable to make this determination, we cannot say that the evidence was inadmissible. However, neither is the evidence probative of the extent to which the college will be benefited by the improvement. Although there is other evidence of benefit to the college, there is no other evidence that the college will be benefited to the amount assessed.

Objector has also argued that the amount assessed against it was not its relative equitable proportion of the entire assessment. The only evidence introduced by objector relevant to proportionate benefit was the testimony of Richard Karnopp, a civil engineer and director of facility services at the college. He testified as to the average consumption of water per month and per day at the college. According to his figures, the average daily use equated to 3% of the $500,000 gallon water storage tank and 1% of the capacity of the old and new tank combined. However, Karnopp later testified that the water usage which he testified to did not include water used by 10 to 12 temporary campus buildings and that the table was inaccurate to that extent. Most of these temporary buildings were occupied. Since this attempt to show proportionate benefit to the college in terms of average daily water use was undermined by admittedly inaccurate figures, it has no probative value.

Although objector's arguments fail in every other respect, since there

was no proof below that the college was benefited to the extent assessed, the cause must be reversed and remanded for further proceedings not inconsistent with the views stated.

Reversed and remanded with directions.

WEBBER and LONDRIGAN, JJ., concur.