(No. 81-CC-113◼

WILMER AGLES, d/b/a Agles Bus Co., Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed October 19, 1983.*

*Order filed September 17, 1984.*

*Order filed December 13, 1984.*

HARRY J. STERLING, for Claimant.

REED, ARMSTRONG, GORMAN & COFFEY (JOHN GILBERT, of counsel), for Respondent.

Roe, C.J.

Claimant, Wilmer Agles, the sole proprietor of Agles Bus Company, brings this claim to recover for the value of bus services provided by Claimant to Southern Illinois University at Edwardsville (SIUE).

The factual situation surrounding the dispute between Claimant and SIUE is complicated because of the addition of third-party intermediaries not involved as parties to the suit. The three intermediaries are the R & G Transit Company (R & G), the Bank of Edwardsville, and the Internal Revenue Service (IRS).

There are basically three business agreements among all the parties concerned prior to May 1980. First, SIUE needed bus service to provide its students with transportation during the school year, so a contract for service was let for bids according to usual procedures. The contract was acquired by R & G. According to the contract R & G would service certain bus runs for SIUE in return for a definite total contract sum, payable in installments over the term of the contract.

The second business arrangement was between R & G and the Bank of Edwardsville. In order to fulfill its contract with SIUE, R & G needed money to finance busses. R & G therefore borrowed money from the Bank of Edwardsville, which took a security interest in the payments due to R & G from SIUE under the bus contract. This lien provided that the monthly payments received from SIUE would be sent directly to the Bank of Edwardsville. The Bank of Edwardsville would deduct its loan payments and then deposit the balance of the money in R & G's bank account.

The third business arrangement was between Agles and R & G. Agles occasionally did subcontract work for R & G. Agles would provide bus service for R & G on several of the SIUE runs and be paid a flat fee of 91 cents per mile for each run. There was, however, no written contract between Agles and R & G. R & G would contract with Agles on a need basis—*i.e.*, when a bus broke down R & G would call Agles and ask them to perform a run. Agles could either accept or decline. Apparently this method of substitution is common among bus companies, especially in instances of mechanical breakdowns; and this arrangement was particularly convenient for R & G, since Agles had in the past held the SIUE contract and was familiar with the runs. It was also convenient since R & G frequently needed help. This arrangement was known to and acquiesced in by SIUE. Harry Lutz, director of auxiliary services at SIUE, testified that he frequently called R & G to correct some difficulty and was told that Agles was handling the run on that particular day. Mr. Lutz then dealt directly with Agles. According to Mr. Lutz' testimony, it did not matter who provided the service as long as the service was provided.

These arrangements worked smoothly until May of 1980, when R & G fell approximatrely $900.00 behind in its payments to Agles. At this point Agles refused to provide any more bus services for R & G. This refusal directely affected SIUE, since Agles was by now being called upon by R & G to provide regular runs for the financially ailing R & G. After several days without bus service, Harry Lutz called Agles to find out what the problem was. Agles informed Mr. Lutz that R & G was $900.00 behind in its payments and that because of nonpayment Agles would not furnish any more busses to R & G for the SIUE runs. Frances Hynes, the secretary for Agles, testified that Mr. Lutz then asked whether Agles would provide bus service if SIUE guaranteed the payments. Mr. Lutz, on the other hand, testified that he asked whether Agles would be more receptive to helping R & G with the bus service if Agles had reasonable assurance of payment, though it is apparent from Lutz' testimony that he did not recall the exact wording of the conversation. In either case it was clear that Agles would not provide bus services to either R & G or SIUE unless the $900.00 was paid. Mr. Lutz therefore instructed Ms. Hynes to send the bill to John Hunter at the Bank of Edwardsville. Ms. Hynes, following Mr. Lutz' instructions, sent the bill addressed as follows: "R & G Transit, care of the Bank of Edwardsville, John Hunter". After a second billing, Agles received a Bank of Edwardsville check, paying the bill in full.

Thereafter, Mr. Lutz called again and requested service of Agles. Ms. Hynes replied that now they would be happy to service the SIUE runs. Acting on this request, Agles provided bus service from May 14 through June 6, 1980, and billed SIUE through the Bank of Edwardsville in the same manner as previously done,

although nothing more was paid to Agles. The total bill reached $4,878.09 and constitutes this claim.

After waiting 30 days until the bill became past due, Frances Hynes then called Mr. Hunter at the Bank of Edwardsville to inquire into payment of the bill. Mr. Hunter told Ms. Hynes that the bill was not paid because there was no money in the account, and he suggested that she call Mr. Lutz. Mr. Lutz explained that the reason there was no money in the account was that the account was R & G's account and that the IRS had placed on the account a lien which had to be satisfied before all other claims. Therefore, instead of the monies passing through the R & G account and going to Agles, SIUE had honored the lien and paid the money over to the IRS. After the original $900.00 had been paid to Agles, Lutz had instructed the bank to determine whether R & G had any money in its account. If there was money in the account, the bank would then call R & G and inquire if the bill should be paid. If R & G authorized the transfer, then the money would be disbursed on a check issued by the Bank of Edwardsville. R & G had authorized the first transfer of funds, but, since the IRS levy had depleted the R & G account, there were no longer any funds which R & G could authorize to pay the subsequent billings, and the system broke down.

There is no question that under normal business conditions an enforceable contract existed between Agles and SIUE. Harry Lutz was in charge of transportation for the campus. He had on previous instances dealt directly with Agles Bus Company. It is apparent from all the testimony that, if there was a transportation problem at SIUE, Harry Lutz was the person to contact. In every aspect Harry Lutz had at the very least apparent authority to contract for bus services. Lutz

contracted a subcontractor, Agles, and gave assurance that the overdue bills of the contractor, R & G, would be paid. Payment was then made by check issued, not by R & G, but rather by a third party, the Bank of Edwardsville. Lutz then requested that Agles provide bus service for SIUE. Agles provided the service, and SIUE accepted the bus service. SIUE argues that its actions were proper since its agent was simply renewing the subcontractor's agreement between Agles and R & G. This argument is not persuasive. There is nothing in the record which indicates that SIUE was given any authority to bargain for R & G, and Harry Lutz was dealing directly with Agles on his own, not with Agles through R & G or at the request of R & G. Lutz therefore requested services from Agles. Agles provided these services directly to SIUE, but SIUE chose to make payments via R & G's account without advising Agles of this payment procedure. Unfortunately for both parties, this method of payment was interrupted by the IRS. While SIUE may argue that Agles' method of billing indicated that Agles accepted the subcontractor's agreement, Agles' method of billing was in fact following the request of SIUE for the convenience of SIUE and not as an acceptance of a subcontractor's role. It is probable that Agles believed he was being paid directly by SIUE and that he was being paid from funds once but no longer earmarked for R & G, especially considering SIUE's failure to fully disclose its method of payment. If there is a mistake in material fact with respect to a contract, and one of the parties knew or should have known of the ambiguity but did not disclose the ambiguity to the other party, the party that fails to disclose is bound by the mistaken party's interpretation. (*Stone v. Those Certain Underwriters At Lloyds, London* (1980), 81 Ill. App. 3d 333, 401 N.E.2d 622).

Since all of the other terms of the contract could easily be implied from the previous dealings and, since Agles did in fact perform to those specifications, and since SIUE did in fact accept those services, a valid contract arose between Agles and SIUE.

Respondent, however, argues that the contract is not enforceable on several grounds because of the fact that SIUE is not a private party but rather an entity of the State government. The first theory in support of this argument proposed is alternatively one of estoppel or invalidity of an implied contract. Respondent's position is that, since Agles had done business with SIUE before, Agles knew that the usual procedure involved in dealing with a State entity is to secure a written contract which has been let for bids and processed through the purchasing department. Therefore, Agles should have known that this was not the proper procedure for contracting with SIUE. It is also argued that Agles had knowledge of the fact that implied contracts with State entities are disfavored under Illinois State law. Both points would have merit under normal circumstances. The circumstances in this situation are not, however, normal circumstances. A review of the facts indicates that SIUE was placed in what can be termed an emergency situation. Bus service for students is a necessary service to an institution such as SIUE. In a situation such as the one at hand, the normal rules of contracting with the university would require too much time. That such circumstances necessitate special rules is well recognized by this court, which has on several occasions sanctioned both oral and implied contracts entered into by State entities when the services provided were of an emergency nature. *Nile Marriot Inc. v. State* (1973), 28 Ill. Ct. Cl. 351; *Elevator Manufacturing Co. of America v. State* (1959), 23 Ill. Ct. Cl. 98;

*Patenberg & Patenberg v. Department of Public Works & Buildings* (1969), 27 Ill. Ct. Cl. 1.

The policy reasons behind these rulings are as strong as they are obvious. The Court of Claims recognizes that expenditures are not always foreseeable and that emergency situations do arise. If State entities are to be in a position where they can handle emergency situations, they must not be burdened with a rule which routinely disallows claims for reimbursement. If this were the situation, clearly no businessman would provide emergency services for the State. This could lead to an extremely dangerous position in case of emergencies, a position which would be contrary to public policy.

The second argument Respondent makes is that, even if this were an emergency situation, Harry Lutz did not have the authority necessary to make a contract with Agles. Lutz denies that he had the requisite authority. This point has some merit and must be carefully examined.

While neither side in this case fully discusses the ability of a person with apparent authority to contract, it is a point of serious consequence when dealing with State entities. Clearly the State cannot be bound by agents with apparent authority rather than actual authority in most situations. Such a policy could be disastrous to the State's budget. On the other hand, it is not clear either from the briefs of counsel or from case law whether a university employee is to be treated in the same manner as a normal State employee. *People ex rel. Board of Trustees of University of Illinois v. Barrett* (1943), 382 Ill. 2d 321, 46 N.E.2d 951, suggests that university employees should be treated as normal *corporate* employees. *Hoffman v. Yack* (1972), 57 Ill.

App. 3d 744, 373 N.E.2d 486, on the other hand, suggests that university employees should be treated as normal *State* employees. While the Court finds it is not necessary to decide this issue at this time, it is necessary to point out that, even if the second view is the correct view and actual authority would be necessary because of budgetary considerations, the policy argument behind the budgetary considerations is not threatened by the factual situation in this case. In the case at hand the budget committee had already allocated funds to provide bus service in this instance. Those funds were paid to R & G and later claimed by the IRS. However, if SIUE mistakenly paid over funds to R & G for services that were not rendered by R & G, then SIUE has an adequate remedy for the recovery of that sum from R & G. Even if that remedy is now illusory, it should be pointed out that the problem here should not have been allowed to develop this far. This is not a situation where a State official has spent funds that were not appropriated. Clearly the funds were appropriated to provide bus service.

This court has previously held that, under certain circumstances when a State entity induces an individual to perform services for its benefit and when it accepts those services with knowledge of the failure to conform to the legal technicalities, the Court of Claims may grant an award for compensation. (*Kent v. State* (1978), 32 Ill. Ct. Cl. 471; *Volland v. State* (1939), 10 Ill. Ct. Cl. 715.) Furthermore, in emergency situations the State is bound by the contracts entered into by those with apparent authority in such situations, since it is obvious that the only actual authority is in the hands of the purchasing departments rather than in the hands of the individuals who authorize the work. *Nile Marriot Inc. v. State* (1973), 28 Ill. Ct. Cl. 351; *Elevator Manufacturing Co. of*

*America v. State* (1959), 23 Ill. Ct. Cl. 98; *Patenberg & Patenberg v. Department of Public Works & Buildings* (1964), 27 Ill. Ct. Cl. 1.

For the reasons stated above, the Claimant is hereby awarded $4,878.09.

## ORDER

Roe, C.J.

This cause comes on to be heard on the Court's own motion, and the Court being advised;

On February 14, 1984, a supplementary order was filed in this matter ordering the Respondent to provide the Office of the Clerk of the Court of Claims certain information within 30 days. Said time has come and gone and nothing has been filed.

The information ordered to be produced related to payment of an award made by this Court nearly one year ago. Specifically, we want a description of the fund out of which this claim would have been paid had it not been filed here and contested, including the name of the fund, its number, and if a nonappropriated account, then a brief description of how the fund operates.

The Court does not desire to issue subpoenas to obtain this information but will do so if necessary. We will grant, and it is hereby ordered that the Respondent be and hereby is given, an additional 14 days within which to supply the information.

## ORDER

Roe, C.J.

This matter is before the Court following the Respondent's filing of a response to our Order of September 17, 1984.

On October 19, 1983, we rendered an opinion awarding the Claimant $4,878.09. In order to facilitate payment we ordered the Respondent to provide us with the name of the account out of which this payment should have been paid, the account number, and, if a nonappropriated account, then a short description of how the account operated. The following information was provided. The account is entitled Transportation Service Cash and is numbered 06-84-7-93454. It is a local account funded by fees.

Ordinarily awards made by this Court are paid with funds appropriated for that purpose by the General Assembly. This is because most claims are made against funds previously appropriated by the General Assembly or arise out of transactions for which the General Assembly makes appropriations. In the case at bar, but for the breach of the contract, the payments would have been made out of the above described local account. Nothing in the record shows that the General Assembly has any direct control or oversight as to that account. It seems to us that the Respondent university is capable of and should pay the judgment we rendered directly out of that account forthwith.

Accordingly, it is hereby ordered that the Respondent pay the aforesaid judgment as soon as is reasonably practical.