(No. 84-CC-3437—)

HARRY B. MELVIN, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed March 2, 1989.*

JAMES K. POWLESS, for Claimant.

LEE ELLEN STARKWEATHER, of Southern Illinois University, for Respondent.

RAUCCI, J.

Claimant seeks recovery against Respondent on two alternative and mutually exclusive theories. First, Claimant alleges that Respondent exercised an option to purchase Claimant's building in Marion, Illinois, for use as a library storage facility, and then, after exercising the option, failed to complete the purchase which resulted in damage to the Claimant. Second, Claimant seeks an award for rental of Claimant's building during a period of time the building was occupied by Respondent, after the conclusion of an initial one-year lease term, during which time Claimant had agreed to waive rental payments for the building because of Claimant's belief that the Respondent had exercised an option to purchase the building. Claimant had allowed Respondent to

remain in the building rent-free in reliance on Claimant's belief that Respondent would complete the purchase of the building under the exercise of Respondent's option to purchase.

Respondent argues that the option contained in Respondent's lease was not exercised; or alternatively, if it was exercised, the exercise and resulting contract to purchase were beyond Respondent's power to contract or were void as being in excess of an appropriation. Finally, Respondent argues that if it is found that Respondent breached a contract for the purchase of real estate, the evidence did not indicate damage to the Claimant.

With respect to the claim for rent, Respondent contends that Claimant's claim for rent is based on "equitable estoppel" and that this doctrine does not apply against Respondent. Also, that Claimant had waived performance of the original rental agreement "and ratified the modified contract," accepting the benefits thereof, and Claimant cannot repudiate the agreement.

The facts are not in substantial dispute. Effective September 1, 1981, Respondent leased Claimant's tract of land in Marion, Illinois, with a large storage building for a period of one year for rental of $120,000. The written lease was drawn by Claimant's attorneys and was executed September 22, 1981. The lease contained a grant of an option to purchase as follows:

"18. As additional consideration for this agreement, the Lessee is hereby granted the exclusive right, privilege and option of purchasing the leased premises upon the terms and conditions hereinafter stated.

(a) The option shall commence on the date of execution of this lease and shall terminate on the 30th date of September, 1982. The exercise of this option by the Lessee must be by written notice sent to the Lessor at her residence address or at such other address as she may from time to time designate.

(b) If this option is not exercised by September 30, 1982, or prior thereto, this option shall terminate unless this lease is extended, as hereinafter provided.

(c) If this option is exercised, the Lessor shall sell and convey the lands to the Lessee, and the Lessee shall purchase the lands from the Lessor on and subject to the terms and conditions stated in this agreement.

(d) The purchase price for the property shall be the sum of $1,600,000.00 payable in cash upon closing. Real estate taxes will be pro-rated and adjusted between the parties as of the date of closing. Except as hereinafter provided, with respect to prepaid rent, no portion of the annual rental shall apply toward the purchase price.

(e) The closing shall occur at such time as the parties may mutually agree, but in no event more than thirty (30) days subsequent to the date of exercise of the option. On the closing date, the Lessor shall deliver to the Lessee a fee simple warranty deed, on the basis of which, a reputable title insuring company will, after recording, insure to the Lessee, at the Lessor's sole cost, a fee simple title to the lands free from all liens and encumbrances except as herein stated.

19. If the option hereinabove set forth is exercised by the Lessee, the Lessor shall on the date of closing or at such time prior or subsequent thereto as the parties may mutually agree, execute a deed of conveyance for a certain sewer line and railroad siding which is adjacent to the subject property. The Lessee shall be relieved of any liability for payment of any consideration for said sewer line and railroad siding, it being understood that the sole consideration for such conveyance shall be the general charitable motives of the Lessor. Prior to the date of such conveyance, the Lessor will at Lessor's expense secure a competent appraisal of said sewer line and railroad siding for the purpose of determining the value of such rail siding and sewer line.

20. It is the intention of Southern Illinois University to exercise the option to purchase the premises at the earliest possible date. However, before the University can exercise the option to purchase, the University must secure funding by action of the Illinois Legislature. Because the time required to secure such funding through the Legislature is not possible to estimate, the parties agree that the Lessee shall have the right to extend this lease and the option to purchase upon the terms and conditions hereinafter stated:

(a) The Lessee may extend this lease by written notice to the Lessor on or prior to September 1, 1982. Such notice shall extend this lease for a period commencing September 1, 1982 through and including August 31, 1983, upon the same terms and conditions as herein stated, including the payment of rent in the amount of $120,000.00 provided, however, such rent shall be payable in one installment of $120,000.00. Such notice shall likewise have the effect of extending the purchase option for a term to expire September 30, 1983, upon the same terms and conditions as herein stated.

 (b) So long as the Lessee is diligently attempting to secure funding to purchase the premises, Lessee shall have the further right to extend this lease at one year intervals by written notice to the Lessor on or prior to September 1, 1983, September 1, 1984, and September 1, 1985. The effect of said notices shall be to extend this lease term for an additional one year period, which notice shall likewise extend the purchase option for an additional year expiring September 30th of the next ensuing year. The rental during each renewal term shall be $120,000.00 annually.

 (c) Lessee's right to extend this option shall be conditioned only upon Lessee's diligent efforts to secure funding for the purchase of said premises. If at any time during the leased term or renewals thereof, Lessee shall determine that it no longer wishes to secure funding to purchase the building, then and in such event the lease shall expire at the next anniversary date and Lessee shall have no right to extend the lease term or the purchase option thereafter."

During the initial months of the lease term in the fall of 1982, Claimant contacted a State Representative to help seek funding for Respondent to acquire Claimant's building as a library storage facility. The Illinois legislature approved the Representative's amendment to the Capital Development Board (CDB) appropriation bill as a part of Public Act 82-938 (SB 1400) effective August 18, 1982, which provided in section 7.1 that $1,600,000 or so much thereof as may be necessary, was appropriated from the Capital Development Fund to the Capital Development Board for the purchase of a library storage facility for Southern Illinois University-Carbondale Campus. The Act provided in addition as follows:

"Sec. 10. No contract shall be entered into or obligation incurred for any expenditure from the appropriations made in this Act until after the purposes and amounts have been approved in writing by the Governor."

Similarly, in 1983, Public Act 83-64 (SB 714) effective August 15, 1983, in section 59, reappropriated the money, or so much thereof as may be necessary and remained unexpended at the close of business on June 30, 1983, from appropriations previously made under section 7.1 of Public Act 82-938.

It is undisputed that at the time of the original lease and option and throughout the term of Claimant's lease, the president of the university and vice president for campus services repeatedly advised Claimant that Respondent wished to acquire Claimant's property as a library storage facility subject to the availability of funds. Shortly before the expiration of the one-year lease term on August 31, 1982, and after discussions between the parties, Respondent wrote Claimant the following letter:

"August 6, 1982

Mr. Harry Melvin
1701 Carrol Drive
Marion, Illinois 62959

Dear Mr. Melvin:

Dr. Albert Somit has asked me to inform you that we are still pursuing the appropriation and release of funds for the purchase of the Bracy Building, and hope it will be forthcoming in the near future.

The University is unable to pay the $120,000 lease charge.

We would, however, be willing to continue custody of the building under the terms of the lease arrangement pending the determination of the availability of funds for purchase.

We appreciate the cooperation you have given us.

Sincerely,

s/Clarence G. Dougherty
Clarence G. Dougherty
Vice President for Campus Services

cc: Dr. Albert Somit"

At the oral request of Respondent for a written reply from Claimant, Claimant prepared and delivered a letter dated August 31, 1982, to Respondent's agent as follows:

"August 31, 1982

Southern Illinois University
Carbondale, Illinois

RE: Bracy Building, Marion, Illinois

Dear Sir:

We are in receipt of your letter stating your wishes to eliminate the payment

of rent on this property and exercise your option to purchase upon receipt of funds. In as much as the Governor has signed this transaction, we agree with this arrangement deleting the rent portion of this lease.

Sincerely yours,

s/Harry B. Melvin s/Virginia Cline"

Thereafter, Respondent's agent made request of the Capital Development Board for the release of $1,600,000 for the purchase of a library storage facility from Claimant. Finally, on April 12, 1984, CDB proposed a real estate purchase contract to Claimant in the amount of $675,000 which proposal was refused by Claimant. Claimant thereupon terminated negotiations with CDB and, by letter of April 16, 1984, terminated Respondent's tenancy on Claimant's property and demanded immediate possession of the premises. Respondent delivered up possession of the premises to Claimant on or about April 20, 1984.

Claimant argues that the letter of Respondent dated August 6, 1982, and Claimant's reply dated August 31, 1982, evidenced and confirmed the existence of Respondent's exercise of its option to purchase Claimant's property. Claimant asserts that the letters combined with other modes of communication between the parties constitute Respondent's acceptance of the terms and conditions of the option. Further, Claimant asserts that the failure of the Respondent to reply to Claimant's letter of August 31, 1982, and specifically those portions of Claimant's letter purporting to allude to Respondent's "exercise" of the option "upon receipt of funds" constitutes a binding contract between Claimant and Respondent independent of a lease agreement such that Respondent was bound to perform.

It is admittedly a true proposition of law that an option contract does not become a contract for the sale

of property until the holder of the option has exercised the same in strict conformity with the conditions therein prescribed. Then, and then only, can the contract be enforced. (*Moehling v. Pierce* (1984), 3 Ill. 2d 418, 121 N.E.2d 735, 737.) Furthermore, we find no fault with Claimant's assertion of the principle that if no specific mode of acceptance is specifically fixed in a contract offer, acceptance need not be in any particular form nor evidenced by express words. (*Calo, Inc. v. A.M.F. Pinspotters, Inc.* (1961), 31 Ill. App. 2d 2, 176 N.E.2d 1, 5.) In *Calo*, which was cited by Claimant, the Court had cause to consider the question of whether a binding contract had been entered into by the parties absent a written acceptance. With respect to the manner of acceptance the Court stated as follows:

"If no specific time limit is fixed with reference to the offer it continues for a reasonable time. If no specific mode of acceptance is specifically fixed in the offer, the acceptance need not be in any particular form nor evidenced by express words. Where the parties make the reduction of the agreement to writing and its signature by them a condition precedent to its completion, it will not be a contract until this is done. (Cites.)"

Claimant's lease, above quoted, provided specifically that exercise of the option by Respondent "must be by written notice sent to the Lessor at her residence address * * *" (18(a) of the lease).

Claimant cites the case of *Memory v. Nippert* (1890), 131 Ill. 623, 23 N.E. 431, for the proposition that Claimant's letter of August 31, 1982, coupled with the continuing assurances of Respondent's agents that the purchase of Claimant's building would be consummated as soon as funds were released, constitutes a binding contract independent of the lease such that the Respondent was bound to perform thereunder. Claimant's letter is quoted above.

In *Memory*, plaintiff ordered 250 boxes of American bacon from defendant. Thereafter, defendant's

agent sent a letter to plaintiff confirming plaintiff's purchase offer, naming the contracting parties, describing the goods to be sold, the time and mode of delivery, the price and mode of payment, and all of the terms which would normally constitute a complete contract of sale. The court engaged the assumption that defendant's agent, in writing the letter, had competent authority from the defendant to negotiate and conclude the sale. When defendant failed to provide the bacon, plaintiff sued for plaintiff's loss. The defense was that the contract was unwritten and barred by a statute of limitations applicable to unwritten contracts. It was the position of defendant, that since defendant's letter was not signed by plaintiff, it lacked mutuality and failed to show the assent of the plaintiff, and was therefore no evidence of any contract whatever. The supreme court held the statute of limitations applicable to unwritten contracts to be inapplicable and concluded that where the "contract" had been accepted and adopted by the party not signing it, he does assent and agree to it on his part, and the law implies a promise to perform. However, the supreme court went on as follows at 131 Ill. 631, 632:

"The delivery of a writing and its acceptance and adoption by the party to whom it is delivered, are necessarily facts dehors the writing itself, and must therefore be proved with extrinsic evidence; and where mutuality is established by proof of the acceptance of the *writing*, the contract is, notwithstanding such resort to parol evidence, a contract all of which is in writing. Of course where the writing is on its face a mere offer or proposition, the acceptance of the paper does not necessarily bind the party accepting to its terms. There must in such case be some further act manifesting an acceptance of the proposition, and whether the contract, after acceptance, will be deemed to be a contract in writing, within the meaning of the fifteenth and sixteenth sections of the statute of limitations or not, must depend upon a variety of circumstances. The rules on this subject are laid down and fully discussed in the case of *Plum vs. Campbell*, 129 Ill. 101. But where the writing on its face purports to be a consummated contract, the mere acceptance and adoption of the writing establishes mutuality, and makes the contract binding on both parties. This would manifestly be the case if the instrument sued on in this case obviously belongs to this class. It is a contract of sale, containing mutual obligations,

viz., on the part of the seller to deliver and on the part of the buyer to receive the goods sold and pay the price. It is therefore a contract in writing, binding on both parties, and containing within itself all the elements of mutuality."

Thus, Claimant offers *Memory* in support of Claimant's position that Claimant's letter of August 31, 1982, to Respondent's agents, when not repudiated by them, constituted both proof of the assent of Respondent's agents to the proposition that the option had already been exercised, and a separate contract for the purchase of Claimant's property pursuant to the exercise of that option.

The First District Appellate Court distinguished the case of *Memory* in *Lundin v. Egyptian Construction Co.* (1975), 29 Ill. App. 3d 1060, 331 N.E.2d 208, an appeal arising from a third-party action. In *Lundin*, third-party defendant H.R. Stewart, Inc. (Stewart), a plumbing contractor, had made a bid on plumbing work in connection with the construction of schools. The bid was evidently orally accepted by third-party plaintiff Egyptian Construction Co. (Egyptian), the general contractor, and Stewart commenced work. There was no written contract between the parties. Three months later Egyptian sent Stewart a letter styled as a "confirming order" which contained an indemnity agreement whereby Stewart was to indemnify Egyptian and other third-party plaintiffs against suits and claims brought against them arising out of the work performed by Stewart. Proof at trial was to the effect that the "confirming order" was intended by Egyptian to be a written embodiment of earlier oral discussions between the parties. The "confirming order" was neither signed nor returned by Stewart. Egyptian was thereafter sued and sought indemnification from Stewart. Egyptian and the other third-party plaintiffs argued that Stewart's continuation of its work on the project after receiving the "confirming order" was conduct on the part of

Stewart manifesting Stewart's consent to the terms of the "confirming order." The Court agreed that while the course of conduct may act as consent to an unsigned contract, the course of conduct must be clear as to what contract the conduct relates. In *Lundin* there was another explanation for Stewart's remaining on the job after receiving the "confirming order" incorporating the indemnification agreement. The court pointed out that Egyptian and the other third-party plaintiffs failed to offer evidence that Stewart's conduct was related "specifically" to the written confirming order rather than to the already existing oral contract for the performance of their bid for the plumbing work.

Claimant in the case at bar admits that shortly before the termination of the one-year lease he attended a meeting with the university president and another university official at which the university's lack of funds to pay rent beyond the expiration of the one-year lease was discussed. It was at this meeting that Respondent's agents advised Claimant that they would be willing to maintain the building and keep it in the state it was in without rental payment until funds could be obtained with which to consummate the purchase. Claimant agreed to allow the university to maintain possession of the premises under their agreement to maintain the premises and to abate the rent because, failing that agreement, the university would have had to vacate the premises. It is the contention of Claimant that the letter of Respondent's agents dated August 6, 1982 (quoted above), constituted an exercise of the option referred to in the lease agreement. However, Claimant does not argue that at the time of the letter of Respondent's agent to Claimant (August 6, 1982), money was then available to the university to complete the purchase.

Respondent argues that section 30 of "An Act in

relation to State finance" (Ill. Rev. Stat., ch. 127, sec. 166), forbids the exercise of the option by Respondent's agent. The statute provides as follows:

"Sec. 30. No officer, institution, department, board or commission shall contract any indebtedness on behalf of the State, nor assume to bind the State in an amount in excess of a money appropriated, unless expressly authorized by law."

Respondent correctly cited *Fergus v. Brady* (1917), 277 Ill. 272, 115 N.E. 343, for the proposition that authorizing payment of claims against the State under any agreement or contract made without express authority of law is null and void. Also, parties contracting with public entities are presumed to know of their limitations in making contracts to bind the public. *East Peoria Waterworks Improvement Project v. Board of Trustees of Community College* (1982), 105 Ill. App. 3d 712, 434 N.E.2d 781.

This Court has considered claims against Respondent in which Respondent has raised the defense that Respondent cannot be bound by the authorized acts of its agents in various types of cases. In *Potter v. State* (1983), 36 Ill. Ct. Cl. 26, it was held that when services were rendered to the State at the instance of persons mistakenly purporting to have State authority to contract, claims for compensation for such work will be denied, no matter how unjust the result, as those dealing with the State are presumed to know the law and deal with the State at their own peril. In *Dunteman v. State* (1985), 38 Ill. Ct. Cl. 51, it was held that a farmer could not rely on oral arrangements regarding the lease of farmland from the State made by the farmer with the "farm manager" for the Department of Corrections, even where the farmer had relied on oral assurances that the farmer could safely make fall preparations of farm ground prior to the formal leasing of the ground for the ensuing calendar year. This Court held as follows:

"It is a well settled principle of law that in dealing with an agent of the State, one must ascertain at his peril the authority of the agent, and the mere assertions of the agent are not sufficient to bind the State (*Midwest Truck & Sales v. State* (1979), 33 Ill. Ct. Cl. 82.)" 38 Ill. Ct. Cl. 51, 55.

Also, this Court has held that oral or implied contracts purportedly entered into by State entities may only be enforceable when services provided to the State were of an emergency nature. *Nile Marriot, Inc. v. State* (1973), 28 Ill. Ct. Cl. 351; *Elevator Manufacturing Co. of America v. State* (1959), 23 Ill. Ct. Cl. 98; *Patenberg & Patenberg v. Department of Public Works* (1969), 27 Ill. Ct. Cl. 1; *Agles v. State* (1983), 37 Ill. Ct. Cl. 134, 140.

Claimant advances serious and compelling arguments that an injustice would result to Claimant if he is deprived of both the benefit of his belief that the purchase option had been exercised by the State and his claim for rental based upon rates under the one-year primary term, for the 19½ months that the University occupied Claimant's premises under a waiver of rent. Claimant asserts he would not have permitted such occupancy had he not believed that the exercise of the purchase option was imminent.

Unfortunately, Claimant's claim based on the exercise of the purchase option must fail for two separate and equally compelling reasons. First, the exchange of correspondence between Claimant and university officials, and the university's subsequent action in maintaining and occupying Claimant's premises under the rental waiver agreement do not offer compelling and precise proof of any specific intent on the part of the Respondent's agents to exercise the purchase option set forth in the original written lease. As in the case of *Lundin v. Egyptian Construction, supra,* the action of the university in occupying and maintaining the premises under the rental waiver agreement with Claimant is equally consistent with the view that the

university officials, as well as Claimant, were hopeful that funding would be provided for the purchase of the facility so that the purchase option could be exercised. Claimant's interpretation that such occupancy and maintenance of the building was consistent with the previous exercise of the purchase option is no more reasonable or compelling. Second, even if we were to construe the exchange of correspondence in August 1982, (quoted above) and the university's action in remaining in occupancy of the building and maintaining it through April 20, 1984, as evidence of the intent of university officials to exercise the option to purchase, such action on the part of the university officials was null and void as being in excess of their authority to bind Respondent to the payment of funds not available for expenditure. Accordingly, Claimant's cause of action arising out of the alleged exercise of the purchase option, and the failure of Respondent to complete the land purchase contract thereby allegedly created, must fail.

With respect to Claimant's cause of action for rent from September 1, 1982, through April 20, 1984, similar barriers obtain. It is clear that Claimant's cause of action for rent is based on an estoppel or *quantum meruit* theory of unjust value being given without compensation. Claimant clearly admits that his agreement to waive rental for the period subsequent to August 31, 1982, was made in the face of unequivocal declarations by Respondent's agents that funding was unavailable to continue to make rent payments as had been done under the one-year primary term of the lease. Claimant argues that the rental waiver was in consideration of Claimant's belief and understanding that the option to purchase had indeed been exercised by the University, and that the purchase of Claimant's property for $1,600,000 was imminent subject to the availability of funds. Although

Claimant had contacts with C.D.B., and in one case made offers to C.D.B. to install valuable improvements in the building to encourage C.D.B. to complete the sale, Claimant contends that at all times subsequent to August 1982, Claimant was of the opinion that the purchase option had been exercised and that an enforceable contract was in existence. However, taking into account the terms of the option in Respondent's lease, combined with the correspondence of August 1982, and the actions of the university thereafter in maintaining possession of the building under the rental waiver agreement, and subsequent attempts to obtain a "release" of sufficient funds to enable the university to complete the purchase, it is just as reasonable to conclude that both Claimant and the university, for the period of time after the expiration of the initial term of the lease, were hopeful of obtaining funding from the Capital Development Board so as to enable the university to exercise its option to purchase Claimant's property. Upon the stipulation of the parties and the testimony at trial, it is equally reasonable to conclude that Claimant's consent to allow the university to retain possession of the building rent-free under the university's agreement to maintain the premises was as much to create "leverage" on C.D.B. and on the university to complete the exercise of the option and purchase of the property as it is Claimant's reaction to the belief that the option had already been exercised and that purchase was imminent.

It is clear that no funding was available under the university's budget or any appropriation to continue rental payments on Claimant's building beyond August 31, 1982. Thus, hypothetically, if university officials had assured Claimant that upon the failure of their ability to exercise the option to purchase, they would reimburse Claimant at the same monthly rate for rent as they had

paid under the initial term of the lease, such an agreement would not have been binding on Respondent for the same reasons as above set forth that any purported exercise of the purchase option by university officials could not be binding on Respondent.

Finally, it is settled that the theory of *quantum meruit* does not apply against the State of Illinois. *Schute v. State* (1957), 22 Ill. Ct. Cl. 592; *Klingberg Schools v. State* (1979), 33 Ill. Ct. Cl. 184, 189; *Thomas v. State* (1968), 26 Ill. Ct. Cl. 252, 256.

It is therefore ordered, adjudged and decreed that Claimant's claim is dismissed, with prejudice.