(No. 85-CC-2636– )

NEW LIFE DEVELOPMENT CORP., Claimant, *v.*
THE STATE OF ILLINOIS, Respondent.

*Opinion filed November 12, 1992.*

PHILLIP A. MONTALVO, for Claimant.

ROLAND W. BURRIS, Attorney General (LE GRAND L. MALANY, Special Assistant Attorney General, of counsel), for Respondent.

## OPINION

MONTANA, C.J.

The Claimant, New Life Development Corporation, filed its claim in the Court of Claims on May 12, 1985.

The State filed its answer and affirmative defenses denying the claim.

Claimant, in its complaint, seeks $999,686 in damages from the State for the alleged breach of a lease and construction contract with the State. The Claimant alleges that the Claimant was to make substantial improvements to a building it owned in East St. Louis, Illinois, and then it was to lease the property to the Illinois Department of Corrections for a community work release center. The State allegedly was to reimburse the Claimant for renovations. Claimant alleges the project fell through after Claimant had completed considerable demolition to its building and Claimant was left with a useless building.

The cause was tried before Commissioner Robert Frederick over several days. The cause has been fully briefed by the parties and the commissioner has filed his report. The evidence consists of the transcript of testimony taken on March 23, 1990, the transcript of testimony taken March 27, 1990, and the transcript of testimony taken April 18, 1990. The evidence also consists of the following exhibits which were admitted at trial:

*Claimant's Exhibits:*

Exhibit No. 1: For Sale building, photographs and literature for 2900 Missouri Avenue, East St. Louis, Illinois

Exhibit No. 2: Mini-mall photograph and literature

Exhibit No. 3: Building photograph and literature for multi-purpose building

Exhibit No. 5: Six photographs of building

Exhibit No. 6: Single photograph of building

Exhibit No. 7: Missouri Corporate Certificate of Claimant

Exhibit No. 8: Survey report from Capital Development Board

Exhibit No. 8a: Completed survey report from Capital Development Board

Exhibit No. 9: Program Statement, Alcoa Building

Exhibit No. 10: Handwritten William Obrock notes and phone message

Exhibit No. 12: Corporate Resolution of Claimant

Exhibit No. 13: First draft of lease

Exhibit No. 13a: Final draft of lease

Exhibit No. 15: Assignment of rents

Exhibit No. 16: 2/3/84 blueprints (CDB) (I)

Exhibit No. 17: 2/3/84 blueprints (CDB) (II)

Exhibit No. 19: Four pages of handwritten William Obrock notes

Exhibit No. 20: March 20, 1984, letter from Mr. Brent of Claimant to Illinois Department of Central Management Services

Exhibit No. 24: May 1, 1984, letter of transmittal as to proposed contractors

Exhibit No. 25: Two publications of invitation to bidders

Exhibit No. 26: May 21, 1984, letter to newspaper

Exhibit No. 27: May 22, 1984, letter to newspaper

Exhibit No. 28: May 23, 1984, letter of William Obrock of Claimant to Illinois Department of Corrections

Exhibit No. 29: June 7, 1984, final blueprints

Exhibit No. 30: Specifications for renovations

Exhibit No. 31: Addendum No. 1 to specifications for renovations

Exhibit No. 31a: Addendum to electrical specifications for renovations

Exhibit No. 32: Telephone bills of Claimant

Exhibit No. 33: December 18, 1984, executed termination of lease executed by Respondent

Exhibit No. 34: Appraisal report of property as of March 31, 1984, by Lance D. Lunte

Exhibit No. 35: Appraisal report of property as of July 1, 1987, by Lance D. Lunte

Exhibit No. 36: Cancelled checks of Claimant totalling $50,292.03 and invoices

Exhibit No. 38: Central Management Services space request by DOC to CMS

Exhibit No. 39: March 16, 1984, letter, Vito Stallone to Wayne Brent

Exhibit No. 40: March 15, 1984, letter from Gary Skoien of CDB to CMS

Exhibit No. 41: March 22, 1984, memo from Vito Stallone

Exhibit No. 42: Handwritten memo by Vito Stallone

*The Facts*

The Claimant, New Life Development Corporation, made its building at 2900 Missouri Avenue, East St. Louis, Illinois, available for sale or lease in 1981. Phil Johnson, a realtor and president of Kenneth Johnson Agency of Belleville, Illinois, was showing the property to prospective buyers or lessees. In 1983, Mr. Johnson had an inquiry from the Illinois Department of Corrections (DOC) about using the property, hereinafter referred to as the "Alcoa Building," as a work release center. Mr. Johnson contacted Mr. Wayne Brent of Claimant about the inquiry and a showing of the building was set up for November 18, 1983, for DOC personnel. Another showing was set up for November 21, 1983, at which time an additional DOC official reviewed the premises. Wayne Brent of Claimant did not know the purpose of the showing as DOC sought to have their inquiry and possible plans for a work release center kept secret due to possible bad publicity.

The building was shown again on November 9, 1983, and on December 14, 1983, to DOC officials and officials from the State's Capital Development Board (CDB). On January 30, 1984, a meeting took place wherein CDB, DOC, and Central Management Services (CMS) officials wanted to discuss with the owner, New Life Development Corporation, preliminary matters as to what would need to be done with the building in order for the State to occupy the building.

Another meeting was held on February 9, 1984, at the DOC building in Springfield. The parties went through the entire proposed lease almost word for word. The cost of figures used were rough figures. DOC preferred that the improvements required by DOC for a work release center be paid for and completed by the lessor and that

when DOC moved into the building the lessor would be reimbursed for the improvements.

On February 15, 1984, Mr. Johnson, the realtor, received a letter from Vito Stallone with the first draft of the proposed lease. The lease was from CMS and was for a five-year lease of the Alcoa Building. Mr. Johnson was to take the lease to Mr. Brent of New Life Development Corporation and if no changes were required, he was to get the lease signed and return it to Mr. Stallone.

Mr. Brent and Mr. Obrock of Claimant went over the proposed lease. The following language was added by New Life Development Corporation and was part of the final signed lease.

"The improvements made are at the request of the lessee under leasehold improvements and that the payments therefore are not to be considered as rent."

Paragraph 72 on page 5 of the final lease was also added. This paragraph interpreted paragraph 71 as to payment for costs of improvements. The changes from the first draft to the final draft are in paragraphs 69 and 72.

The lease was signed on February 18, 1984. On February 29, 1984, a press conference was held to announce the renovation of the building into a work release center. Many politicians and government officials attended the press conference. Mr. Johnson was to receive a fee for his work of 5% of the gross amount of the lease once the lessee took occupancy of the building. He has never received any payment from Claimant. Mr. Johnson's only other involvement was to allow inspectors into the building to inspect the building.

Wayne Brent was a real estate developer who was a stockholder in Claimant, New Life Development Corporation. He was an officer and director in 1983 and 1984.

New Life purchased the building at 2900 Missouri Avenue, East St. Louis, Illinois, in 1978. The purchase price was $100,000 as it was. They put about $25,000 into the property up until 1983. There was a tenant in the building when it was purchased and there were plans to turn the building into a mini-mall. They had some tenants in 1983. All tenants were out by December 31, 1983. In the winter of 1984-85, the property was vacant. The present status of the building is that it is totally gutted. Most of the windows are out or broken.

In the fall of 1983, Mr. Brent received a call from realtor Johnson in reference to a prospective tenant for the entire building. Mr. Brent did not know who the prospective tenant was for over a month. Even then he did not learn the purpose of the State's interest for some time. He learned the State liked the building and in January of 1984 he learned that DOC was the agency seeking to use the building. He met with State officials to work out a lease. This was the February 9, 1984, meeting. The State was at the point of entering into a lease agreement on the building. The State had proposed blueprints dated February 3, 1984, for use at the February 9, 1984, meeting.

At the February 9, 1984, meeting the State indicated the building was not suited for the intended purpose of DOC. The State wanted to lease the building as is from Claimant. However, the State wanted the building renovated as quickly as possible for their intended use and by the Fall of 1984. It was believed the Claimant could renovate faster than the State could.

Initially Claimant wanted to just lease the property as is to the State. As discussions continued, there was more interest in Claimant taking on the redevelopment. Claimant had to obtain financing for the renovations

because a sizable amount of money would be required. Claimant obtained commitments for the renovations from two banks. DOC officials advised the Claimant that the State had the funds to reimburse Claimant for the renovations. The banks verified the funds availability. In the lease there was an escape clause in the event there was not an appropriation for that particular lease.

Mr. Brent believed there were two contracts. One contract was the five-year lease. The other was for the renovations. He felt Claimant could not do one without the other, especially with the time frame of the State wanting occupancy by September 1, 1984. DOC had advised Claimant that DOC already had $4 million available for correctional facilities. The renovations for this project were going to be about $1,600,000. Mr. Brent agreed that the basic terms of the lease were agreed upon at the meeting on February 9, 1984. After receiving the draft of the lease, Mr. Brent and Mr. Obrock of Claimant took the draft to their CPA to determine the tax effects of the lease. They were concerned as to the income effect on Claimant of the reimbursement for the improvements. They did not want the reimbursement by the State for improvements to be considered rent which would have had a disadvantageous tax effect on Claimant.

The State was going to pay a lease rate for an as is building and reimburse Claimant for the improvements to be made. The additions to the lease that became the final lease were included by Claimant on the basis of the accountant's concerns. Claimant informed CMS of the requirement that paragraph 69 be changed. The State then added paragraph 72. Shortly after the changes were made, Claimant, and then the State, signed the lease. The lease was signed February 27, 1984. Mr. Giordano of CMS signed the lease on March 22, 1984.

Mr. Brent did not work on the plans for the renovations and the cost estimates for the renovations. This was Mr. Obrock's bailiwick. On February 14, 1984, Claimant enacted a resolution to borrow $150,000 to begin the project. The Claimant assigned its rents to the bank to receive its loan in addition to a real estate mortgage. Mr. Brent also recalled the press conference following the signing of the lease. He recalled that Michael Lane, Director of DOC, assured him the lease was signed and that the State was 100% behind Claimant.

Upon the signing of the lease Claimant moved into the demolition phase of the project. Claimant was to take drawings prepared by CDB and remove certain partitions of the building. The building was to be cleared and made ready to put in new equipment. At this point all the previous occupants were out of the building. Demolition work proceeded until May 11, 1984. Total expenditures by Claimant for demolition totalled $50,292.03. Mr. Brent was also the owner of the company that was the prime contractor for the demolition work. During the demolition work Mr. Brent would often see representatives of different State agencies examining the project. He recalled representatives of DOC and CDB being present. CDB representatives would mark walls and make sure Claimant did things exactly the way they wanted it. He also received calls from DOC checking on the renovations during this period.

After demolition work was completed in May, Claimant let out bids for the renovations. On June 22, 1984, an official bid-opening occurred at the mayor's office in East St. Louis, Illinois. At the State's request, minority participation was emphasized. The bids came in close to the anticipated estimates of cost.

The first time Mr. Brent learned of a problem with the project was when the realtor Johnson called him about a newspaper article in July of 1984 indicating that the State senator in whose district the project was located had reversed his position on the project. On July 18, 1984, the appropriations bills for the Department of Corrections were signed by the Governor and upon signing became effective as law. The appropriations bills stated that no monies could be expended in St. Clair and Madison counties. The senator's amendment to the appropriations bills put chaos into the project. His amendment stopped the project although the State agencies felt there might be some relief in the Fall veto session. However, the funding was never restored.

Claimant was sent a termination notice form dated November 13, 1984, from the State indicating there had not been funds appropriated by the General Assembly so the lease No. 03985 was terminated.

In regard to the renovations, the Claimant did receive $32,000 from the State. Paragraph 72 of the lease indicated that if for any reason the lease did not go forward, Claimant would be reimbursed for certain architect and engineering fees. Claimant received no other monies from the State.

Eventually, after the project fell through, Claimant abandoned the building. It was impossible to secure the building in its present condition and it cannot be insured. Claimant has tried to sell the building but has not received any offers of value.

Mr. Brent admits that the contract is one document but he believes it has two separate parts. The entire project was contingent on the directors of CMS and DOC approving the total costs of the project in writing. The

State was going to lease the building but it had to be in turnkey condition. The contract called for Claimant to come in to the State with a set of plans and a cost estimate. These were to be presented to DOC and CMS for written approval. It was Mr. Brent's belief that the State was not entitled to Claimant's drawings and cost estimates because CDB provided their own drawings to be used and CDB directed Claimant to take bids from the appropriate subcontractors. He believed that this procedure let the State know what the costs were going to be. The State was also made aware of the costs on the date of the bid openings, June 22, 1984, as some State people were at the bid opening according to Mr. Brent.

It was Mr. Brent's position that by the State's actions the costs and plans were approved even if he could not produce a written approval signed by CMS and DOC. He believed the banks would not have loaned New Life the money for renovations if the whole deal was off or if the lease fell through.

On cross-examination Mr. Brent admitted that there was one contract for the lease of space in a certain condition. It had two parts, being the lease and the renovations. Mr. Brent had an attorney verify the legal description in the document in the event the State purchased the property. However, he did not have the attorney comment in regard to the contract language. The State officials encouraged the demolition according to Mr. Brent. No one from the State told New Life not to begin work until further documents were presented and approved. The State also indicated that they wanted New Life to use minority contractors.

William Obrock was a stockholder, officer, and director of New Life, too. Mr. Obrock was also the owner of a

company named Design Built Collaborative, Inc. This was the company hired by New Life to do the design of the technical documents for the renovation. Design Built was an architectural and construction company. CDB gave New Life blueprints with all of the project's dimensions. The State proposed it all. The State had people go through the building prior to the blueprints being drawn. New Life was anxious to rent the building in 1984. They were not excited about doing the renovations. New Life did not want to go out and borrow money to pay for renovations over an extended period of time. They did not want to be in a position where the State did not renew the lease after five years and be unprotected and have to pay for all the improvements for a single-purpose building.

New Life was concerned about putting in all the improvements and the State just walking away. They wanted to rent to the State and have the State pay for the improvements. The agreement New Life felt it had made with the State was that New Life would put in the improvements and the State would reimburse New Life in a one-time single payment for the entire project. This payment was to be made when the State occupied the space. The State poured over every detail of what New Life was doing. New Life followed every rule the State put forth on minority hiring and publication notices.

Mr. Obrock testified that paragraphs 69 and 72 were added to the original draft of the lease for two reasons. The first reason was for tax purposes. Claimant wanted it clear that the reimbursement for renovations payment was not to be construed as rent. The State always considered such payments as rent for the State's purposes. The second reason was they wanted clarity in the contract terms. The concept was that the reimbursement would

be a one-time payment. Claimant was putting in the improvements for the State because the State did not want to put them in. The State could not put the improvements in as fast as Claimant because the State has certain legal procedures it must follow that a private company would not have to follow. Mr. Obrock felt that this was an accommodation for the State and that it was a side agreement to the basic contract. Claimant was going to be the architect and the engineer on the project. Claimant was going to prepare all the documents describing the scope of the work. Claimant then would oversee the construction.

Claimant prepared the technical documents at the CDB's direction. CDB monitored and approved what Claimant was putting into the project. On March 7, 1984, Mr. Obrock met with DOC, CDB, and the State's design team on the project. The State made suggestions as to what should be done to the building and Claimant may or may not have agreed to the suggestions, depending on feasibility. He believed the State did cost estimates but they would not tell Claimant what they were. Section 72 of the lease stated that after execution of the lease by all parties on February 29, 1984, Claimant would prepare detailed itemization and allocations of costs to the lessor and lessee for the improvements. The lessee would approve or disapprove the itemizations or enter into negotiations with Claimant regarding cost adjustments within 14 days. Claimant believed the meeting of March 7, 1984, satisfied this contract requirement even though no one complete document that included all specifications for improvements and cost allocations was ever presented by Claimant to the State.

Mr. Obrock believed the on-going discussions with the State as the project developed and as the costs estimates

evolved stood as satisfaction of the contract contingency. Mr. Obrock believed everyone knew the costs and that they were $1,600,000 to $1,700,000. However, Mr. Obrock admits the State never said they agreed or disagreed. The State never said these costs were accepted or rejected.

Claimant did prepare detailed drawings describing the scope of the work. The drawings were continuously updated until the bids were solicited. The State went over the drawings and specifications and checked off everything and made additions thereto. When the bids came in, they were very close to the $1,700,000 estimate.

Mr. Obrock testified that no one from the State ever asked for a single document that itemized the costs and the allocation of costs on the project. He believed the continuous interaction with the State, that by doing everything the State told them to do, and by acting in good faith, that Claimant was performing the contract. While they would not know the exact costs of the project until the bids came in, they did have budgets they expected to meet.

After the bids came in and Claimant had the actual costs, Mr. Obrock intended to sit down with representatives of the State and go over the costs and the contractors selected and obtain the State's concurrence. He was never able to do this. The State officials would not return his calls. Claimant was ready to proceed with the renovations but the State would no longer fund the project.

Mr. Obrock testified that the demolition phase was begun by Claimant based on the word of Michael Lane, Director of DOC. According to Mr. Obrock, Mr. Lane told Claimant that he had signed the lease, the money was in place, and to get on with it. The building had

36,000 square feet in it. It was long and narrow and had many windows. It fit the State's needs very well. The building, however, had to be converted from a laboratory research building into a dormitory. All new air conditioning, all new mechanical, and all new electrical wiring had to be put in. In the demolition phase, Claimant stripped all of the utilities out. All of the exterior windows had to be taken out and many other portions of the building were removed, including walls and part of the roof.

The State, at some point, did an inventory to see if everything had been done in the demolition phase according to what the State wanted. The demolition phase went from March to May. The renovations would have taken 90 to 120 days if the project had proceeded.

Raymond V. Lunte, a real estate appraiser, testified for Claimant. He did two appraisals of the property. One was as of March 31, 1984, and the other was for July 1, 1987. For the 1984 appraisal, Mr. Lunte assumed a five-year lease of the building as a correctional institution and that the lessee would buy the property at the end of the five-year lease pursuant to the terms of the lease rather than for the State to continue to rent the property. The appraiser's conclusion using these assumptions was that in 1984 the property was worth $970,000. The second appraisal as of July 1, 1987, showed a gutted building in a very poor condition. In this appraiser's opinion the building had no value. He believed it would cost more to renovate the property than it would be worth. He further believed the land value was not enough to warrant the destruction of the building. The appraiser admitted that the area where the Alcoa Building was located was a depressed area with low property values.

The State's witnesses were Wally Claypool who was

with CDB at the time in question, Vito Stallone of CMS, Dan Bosse of DOC, Jack Hutchison of DOC, and William Barham of DOC.

Mr. Claypool supervised the survey unit of CDB. He would support the construction function of CDB and provide technical assistance to other agencies by conducting field surveys of existing buildings and evaluate the scope of work on the buildings. He evaluated the Alcoa Building. DOC had proposed to use that site as a place to house prisoners in a minimum security work release setting to alleviate prison overcrowding. He looked at the building to see if it was feasible to use the building for that purpose. His unit created suggestions for ways the building might be altered to fulfill that purpose. Prior to the March 7, 1984, meeting they had prepared a floor plan sketch for the project.

While he was involved in the project it was only at a very preliminary stage. It had not been given the status of a construction project by the State. If the project had moved from the survey phase to the construction phase, it would have gone through a whole design process and been reviewed by a different unit. According to Mr. Claypool, this project never left the preliminary phase. It never moved into the design phase as it never left the survey preliminary sketch form. However, Claimant's Exhibit No. 87, the sketch, has design phase labeled on it by CDB. Mr. Claypool approved the document with "design phase" written thereon. He could not explain this discrepancy in his testimony.

After the February 7, 1984, meeting it was Mr. Claypool's understanding that CDB would have no more involvement in the project. DOC could have gone ahead

with the project. He would, however, have been advised if DOC was going ahead with the project.

Vito Stallone was with CMS. He leased office and warehouse space for the State of Illinois. He was involved in negotiating the lease terms for the Alcoa Building. He drafted the first draft of the lease on or about February 10, 1984. The final lease was signed March 22, 1984. The lease required the Claimant to do an extensive amount of renovation. The lease was contingent so that the State could get out of the lease. This was because the lease was agreed upon in one day and because it was an unusual lease for the State because of the extensive renovations required and the uncertainty of the costs. The lease was written so that the State had an option to terminate the lease if the State did not want to expend the amount required to make the renovations. Therefore, the lease had a contingency that provided for approval by both directors of DOC and CMS at a later date after they received the costs for the renovations involved.

The contingency was to protect the State on the costs of renovations. The lessor was to provide the State with a document showing the costs before any commitment from the State to go on with the contract. CMS never approved the costs. CMS never received any written bids or written proposals on costs from Claimant. Vito Stallone testified that he specifically told William Obrock that the contract was contingent on funding by the legislature. In Mr. Stallone's opinion this was not a contract to lease a building as is and then fix it up, but a contract to lease a building in turnkey condition.

The Claimant, as owner, was responsible for putting the building in turnkey condition. Mr. Stallone disputed the amount of demolition alleged by the Claimant, testifying

that the peeling paint had not been removed, a big boiler had not been removed, an air handling unit and some light fixtures had not been removed. All of these things should have been removed during the demolition phase.

As to the amendments in paragraphs 69 and 72, Mr. Stallone's interpretations differed from those of Claimant. Under the State's accounting system, the State considered the lump sum reimbursement for leasehold improvements to be rent. These leasehold improvements were to be paid from funds appropriated to DOC. Mr. Stallone testified that these funds were not in place at the time the lease was signed. Mr. Stallone testified that he had conversations with Mr. Obrock of Claimant where he made it clear this whole contract was subject to legislative appropriation. However, Mr. Stallone had to admit on cross-examination that the State documents initiating this project indicated that DOC had already received funding for proposed work release centers. Mr. Stallone further claimed that the amendment to paragraph 69 was at the request of lessor solely to accommodate lessor's income tax situation.

Upon review of Mr. Stallone's file on the case during trial, Exhibit 8A was located which was a survey of the project. Exhibit 8A had dollar amounts thereon and showed an estimated projected cost for the project at $1,740,000. The dollar figures appear as of January 3, 1984. The final lease was sent by Mr. Stallone to Mr. Brent of Claimant for signatures on March 16, 1984.

The records of Mr. Stallone indicate the Claimant would not agree to pay for any improvements. Therefore, an option clause was agreed to which enabled the State to purchase the building for a predetermined amount and thereby recover the benefits that might exist from improvements extending beyond the normal lease term. The State was anticipating paying for the improvements.

Dan Bosse was the manager of the Capital Programs Unit for DOC. In 1983 the Illinois Supreme Court struck down the manner in which DOC was granting meritorious good time to prisoners. Therefore, the need for prison space greatly increased. DOC started looking for bed sites, including new work release centers. For the project at the East St. Louis location he never saw more than preliminary plans. The survey plan done by CMS was requested by DOC. If there had been DOC involvement in construction he would have been involved in it. He was never involved in any such construction.

John Hutchison was the deputy director for administration and planning for DOC in 1983 and 1984. He supervised the fiscal, accounting, and funding units of DOC. In 1984 community correctional centers were to be funded from one of two lump sum appropriations. This was not a part of the State's capital budget but was from a separate appropriation for these community correctional centers. The State did not spend all of this appropriation for 1984. The DOC sought a reappropriation of these funds in 1985. However, there was opposition in the legislature for the East St. Louis project. The legislature actually included language in the reappropriation that excluded any development of community correctional centers in St. Clair County and this specifically prohibited DOC from continuing the East St. Louis project at the Alcoa Building.

Mr. Hutchison never saw any plans or specifications for construction of the East St. Louis project and any such documents would have come to him. He did not recall ever receiving even a disputed bill for construction or renovation at that site. The State looked at dozens of sites for work release centers. The State had only originally

appropriated $4 million and there was not enough appropriated to fund all the sites being looked at.

Mr. Hutchison believed the State had a lease with Claimant that said once New Life completed their specifications and had bids that New Life had to come back to DOC for approval. This was so DOC would know what the construction costs of this project would be so that DOC could plan these costs into DOC's spending for the year. Even if Michael Lane, the Director of DOC, had told Claimant the money was available for the renovations, there still had to be a contract and DOC would only act in accordance with the contract. Under the lease with New Life, for DOC to approve vouchers for payment, the contract would have had to be completed by New Life bringing in the actual bids. For the vouchers to have been approved for payment, they would have had to have been submitted by June 30, 1984, because after that time they would have been disallowed for any new bids in East St. Louis, Illinois. In this case the legislature took the unexpended 1984 appropriation and reappropriated it for 1985 with the exclusion for St. Clair County.

William L. Barham of DOC was in the Capital Programs Unit. He viewed the Alcoa Building about 20 times in 1983-1984 over a period of several months beginning in December of 1983. His purpose was to go over the building to see what would be needed to remodel the Alcoa Building for use as a community correctional center and work out a floor plan. He worked with CDB people to work up specifications. He never supervised anything or directed Claimant to do anything. He did recall Claimant ripping out unneeded plumbing, piping, and other unneeded parts of the building. The people working on this demolition were not working for the State. The State people changed the floor plan in their own

mind a dozen times as they looked at the building. There would have had to have been some demolition before the renovations could begin.

Douglas A. Brown also testified, pursuant to an evidence deposition. In 1983-84 he was deputy director for community services of DOC. He ran the State's community corrections programs. Mr. Brown initialed the final lease which laid out the conditions under which the State would lease the Alcoa Building. His responsibility was to work with the Claimant to get the building in shape for a work release center assuming everyone could cross all of the proper legal boundaries. He also was responsible for trying to obtain community support for this work release center. At the February meeting and at the news conference announcing the center, no approvals were ever given by the State to the owners for any work. All the State was doing was signifying its intent to be in an acceptable building at an acceptable renovation price. According to Mr. Brown, who now works in Maryland, the March 7 meeting in Springfield ended with an agreement in general terms as to the items that would have to appear on a final plan for renovation which Claimant was to supply DOC in the future. CDB had given technical assistance in preparing a survey of what would have been required for the correctional center and a cost estimate. CDB had no further involvement. CDB would have been involved later on as technical advisers if Claimant had presented a final proposal and cost budget for review by the State. At the March 7, 1984, meeting, no approval was given by the State for construction or construction plans. Mr. Brown was very familiar with paragraph 71 of the lease. In the event New Life had submitted materials to DOC for approval under the contract, the documents first would have gone to the people in the capital development section of

DOC who would have obtained technical advice from the CDB. The documents then would have come to Mr. Brown for approval before he would have sent it to Director Lane of DOC with a recommendation for approval or disapproval. Mr. Brown never received any final plans and specifications from Claimant.

The State was looking at many sites for new prison beds. There was a lot of competition for the money that was available. The State required final cost approval to look at cost per square foot to determine if the project was acceptable and consistent with the cost per inmate they would have expected to use in any correctional facility. Mr. Brown testified he never told Mr. Obrock on February 29, 1984, to begin demolition work. He testified he would not do so because CMS had not signed on the contract. CMS did not sign on the lease until March 22, 1984.

Of the $4 million originally appropriated for community correctional centers, about $2 million was never used for these projects.

Mr. Obrock testified in rebuttal that Mr. Brown told him to proceed with the demolition at the time of the press conference on February 29, 1984, or they would never finish the renovations by September of 1984. Mr. Brown assured Mr. Obrock the funds were available according to Mr. Obrock. Mr. Obrock further testified they did submit Exhibits 29, 30 and 31 as final cost and specifications to the State prior to June 18, 1984. The documents were sent to Pat McNanamon and Wally Claypool of the State. Mr. Brown testified he never saw these plans and specifications that Claimant says they produced.

*The Law*

For all of the involved testimony, the numerous exhibits, and the extensive briefs, this case comes down to a simple case of contract construction. This case is also a primer on how to deal with the State on a construction project. Anyone who deals with the State has to understand that you do not work on a handshake. Every "i" must be dotted and every "t" crossed. Whether it was wishful thinking or pure naivete, Claimant did not follow the letter of the contract but only the spirit. Under the present state of the law, that is not good enough. The written contract prevails here. Claimant's position that an oral contract or implied contract exists must fail as this is not a contract of an emergency nature. *Melvin v. State* (1989), 41 Ill. Ct. Cl. 88.

One can see easily the situation from the Claimant's point of view. They have a building with $125,000 into it in a depressed area in 1983. The State comes along and wants to rent and possibly buy the building. Claimant sees a five-year lease and a probable sale at a nice profit. The problem comes in with the renovations. Claimant would rather not do the renovations but the State talks them into it. The State does not renovate buildings it does not own. It is faster for Claimant to do the renovations because the State has so many rules, regulations, and statutes to follow in order to build. Everyone wants the lease going by September of 1984. Everyone also tries to protect themselves. The Claimant does not want to pay income taxes on the renovations so the repayment is not called rent. The State puts in a double contingency. The State can terminate the lease if the legislature does not appropriate funds. The State also put in provisions as follows for the second contingency:

"71. This lease is contingent upon written approval by the Director of the Department of Central Management Services and the Director of the Department of Corrections of the Lessee's share of the total cost of this project.

It is further agreed that if said approval is denied then the Department of Corrections shall reimburse the named Lessor for one-half the costs incurred for architectural and engineering fees, in an amount not to exceed $32,000.

72. Paragraph One of Article 71 above shall be interpreted as follows. After execution of this lease by all parties, Lessor shall prepare firm costs for the necessary improvements with detailed itemization and allocation of costs to Lessor and Lessee. Lessee shall within fourteen days of receipt either approve, disapprove, or enter into negotiations with lessor regarding cost adjustments. If approval is not given initially or after negotiation, this lease shall end immediately without penalty or obligation to either party except as provided in the second paragraph of Article 71. No reason for disapproval need be given."

Public Act 83-1199 which took effect July 1, 1984, officially ended this project. The legislature specifically stated,

"No funds reappropriated pursuant to this section or appropriated pursuant to Section 8 shall be used for the expansion of existing, or the development of new community correctional centers located within St. Clair County."

In construing this contract and determining the intentions of the parties, the instrument must be considered as a whole. (*McDonnell-Douglas v. State* (1984), 36 Ill. Ct. Cl. 46.) It is undisputed by the evidence that the Director of DOC and the Director of CMS never approved the State's share of the total cost of the project in writing. These dual signatures were an important contingency in the lease to protect the State. The lease itself, as argued by Claimant, could not be the written approval because the interpretation of the clause specifically calls for written approval after the lease was signed and after firm costs for the project with detailed itemization were served on the State. There is some dispute on whether costs and specifications were given to the State and whether the State was aware of the bids from the bid opening ceremony, but that makes little difference in this

case because there was never any proof of acceptance in writing. The Claimant failed to prove it prepared final firm cost figures and served them on the State by something as simple as a return receipt. The evidence is clear that absent written approval by the two directors, the State could terminate this lease as to the renovation reimbursement without additional penalty because the State was protected by both contingency clauses.

The rights and obligations of the parties are to be determined from the plain, unambiguous wording of the contract. There can be no oral modification of the clear terms of the contract without the consent of both parties to the contract. (*Hoel-Steffen v. State* (1983), 35 Ill. Ct. Cl. 108.) Claimant seeks an equitable remedy in this Court or in the alternative asks this Court to find compliance with the contract terms based on substantial compliance.

While the evidence is contradictory, it is not hard to fathom the State official urging Claimant to move quickly on this project and assuring Claimant funds were in place. However, the law is clear. The representatives of the State could not bind the State based on their actions. (*Bellini v. State* (1982), 35 Ill. Ct. Cl. 701.) It is a well-settled principle of law that in dealing with an agent of the State one must ascertain at his peril the authority of the agent and the mere assertions of the agent are not sufficient to bind the State. (*Melvin v. State* (1989), 41 Ill. Ct. Cl. 88.) Under the law, if the officials urged Claimant to start demolition, Claimant should have just said no. A handshake and statements that funds are in place were not good enough to rely on in the face of the written contract contingencies. Implied contracts are not favored by this Court. (*Edwards v. State* (1989), 42 Ill. Ct. Cl. 116.)

It is a sad but true commentary. Because Claimant never received written approval of firm costs to bind the State to pay, the State could terminate the contract for any reason without additional penalty. Claimant's only recovery was the $32,000 for architectural and engineering fees for which Claimant has been paid by the State.

Even Mr. Obrock admits Claimant wasn't to be paid for the renovations until the State moved in. The State never moved in and properly so. Claimant concedes in its brief that they have no claim for rent. It is also difficult to find substantial compliance when there is no proof the State ever received firm costs with itemizations and allocations and the Claimant never did move on to the renovation stage.

While it is true that the Claimant acted by doing some demolition to its building, which at the time may have benefitted the State, and while it would be easy to be sympathetic to Claimant's situation, there is a long line of cases which hold that Court of Claims jurisdiction does not encompass equitable remedies such as *quantum meruit*. In this respect the Court of Claims differs from courts of general jurisdiction. Persons dealing with the State are held to whatever terms the legislature may impose. The result of these limitations may be seen as harsh in some instances, but the legislature has not authorized the Court of Claims to act otherwise.

The Claimant has failed to prove the State breached the lease. The State bargained for and received two contingencies in the lease and used them both to validly terminate the lease. It is unfortunate that the Claimant is left with this building in the condition it is in, but the Claimant chose to proceed with demolition work without the two written approvals required by the clear wording of the contract.

The one mitigating factor for Claimant is that the loss to Claimant does not appear to be nearly as great as the appraiser's testimony indicated. It is hard to fathom that a building purchased in 1979 for $100,000 could become worth almost $1 million in 1983 in a depressed area. The appraiser's assumption of a completely renovated correctional center to reach his value is not well taken. Be this as it may be, the Claimant did have some loss but loss that is not compensable in this Court.

## Conclusion

For the foregoing reasons it is hereby ordered that this claim be, and hereby is, denied.