(No. 94-CC-0472–)

THOMAS RUBIDOUX and RICHARD SASAK, Claimants, *v.* NORTHEASTERN ILLINOIS UNIVERSITY and the BOARD OF GOVERNORS OF STATE COLLEGES AND UNIVERSITIES, Respondent.

*Opinion filed October 15, 1998.*

JAMES POTTER, for Claimants.

DUNN, GOEBEL, ULBRICH, MOREL & HUNDMAN (DAVID L. STANCZAK, of counsel), for Respondent.

## OPINION

EPSTEIN, J.

This claim for $113,927.12 for unpaid rent and consequential damages arises out of the Claimants' rental of apartments in their building, located at 4900 N. St. Louis Avenue, as a student residence for student-athletes of the respondent Northeastern Illinois University (the "University") in the 1990-91 academic year under a letter agreement with the university's Director of Athletics, Intramurals & Recreation.

The case was tried to Commissioner J. Patrick Hanley, who has filed his report to this Court. The case is before us on the second amended complaint, the trial record, the parties' post-trial briefs, and Commissioner Hanley's report. The exhaustion of alternative remedies issue, which was reserved when we denied without prejudice Respondent's motion to dismiss for failure to exhaust, is also before us. The full Court heard oral argument on the merits, and we now render our decision.

### Nature of the Claim

The second amended complaint is in three counts: count I asserts a breach of contract claim, based on the August 1, 1990 letter agreement signed by Claimant Sasak and by Director Dennis Keihn; count II asserts an "implied contract" claim, based on the parties' alleged intent, the apparent authority of Director Keihn, and the parties' course of conduct; count III asserts a misrepresentation claim, based on the University's alleged misrepresentations of its intent to use the Claimant's building, its commitment to the agreement with Director Keihn, and its ability to pay the unpaid back rents on apartments rented to University students.

Claimants seek $40,668.75 in unpaid rents for 1991-92, $20,167.69 in unpaid rents for 1990-91, and $16,438.03

for damage to the premises caused by the resident student athletes, plus interest at 9 percent.

## The Facts

At the trial, each side presented three witnesses: Thomas Rubidoux, Wayne E. Silverman and Richard Sasak for the Claimant; and Thomas Rubidoux, Rees Johnson, the head men's basketball coach at the university, and Richard Knar, Jr., an assistant men's basketball coach at the university for the Respondent. The testimony of two witnesses, Dennis Keihn and Peter Wolstein was given by their evidence depositions. Claimant's eight exhibits and Respondent's seven exhibits were all admitted into evidence.

## Testimony of Thomas Rubidoux

Mr. Rubidoux, one of the Claimants, testified that he and his partner Richard Sasak, owned a 31-unit apartment building at 4900 to 4908 North St. Louis, in Chicago, which they purchased in 1988; all units were occupied. He was approached by Mike Fogel, an employee of the university and the women's basketball coach, who asked whether Claimants would be interested in housing student athletes from the university. Fogel told Claimants in June, 1990 that Dr. Dennis Keihn, the university athletic director, had authority to move students in and to sign agreements. Claimants told Fogel that they were not interested in having young students in the building. About a week later, Dr. Keihn called Rubidoux and requested a meeting. Rubidoux and Sasak met with Keihn one week later. Keihn said that the university wanted to find housing for its student athletes but emphasized the men basketball players.

Claimants told Dr. Keihn that they were reluctant for a variety of reasons, one being that the building was then full. Dr. Keihn told them that the university would

be responsible for handling the rents and making sure there was no destruction to the building. Dr. Keihn told them he had the authority to pursue contracts and had funds available to him.

Mr. Sasak wrote a letter to Dr. Keihn. (Claimants' exhibit no. 1.) After that letter, Dr. Keihn met with the Claimants a second time. Dr. Keihn told Claimants that the university would be responsible for rent and damages. After this second meeting, Dr. Keihn faxed a July 16, 1990, letter to them. [Claimants' exhibit no. 2.] Both parties were then looking for a multiple year commitment. Dr. Keihn told Claimants that he had talked to the university president.

Dr. Keihn and Claimants had a third meeting. Claimants were concerned about the apartments during the summer months; it was decided that 12 months of rent would be paid over nine months and the university would be free to use the apartments during the summer months. Coach Rees Johnson attended the third meeting. Although Dr. Keihn had earlier indicated that the university would pay Claimants directly, he told them this would not be possible for the first year because all budgets had already been established. He asked that Claimants accept the rent money from the students or the coaches for the first year.

After the third meeting, Dr. Keihn faxed an August 1, 1990, letter to Claimants. (Claimants' exhibit no. 3.) Rubidoux understood the language of the letter to mean that, in the first year, the university could not pay them directly and they would be paid through the students and coaches. The university was given keys to the apartments. Claimants did not have control over the decision of which students occupied which apartments. A fax from Coach Knar was sent to Claimants to show which students were

to be in each apartment. (Claimants' exhibit no. 4.) Eight apartments were made available for students.

Rubidoux had no doubt that Claimants' agreement was with the university. Dr. Keihn told Claimants that the university guaranteed the payments. Claimants received money from university employees on three occasions. No one ever told them that they did not have a contract with the university.

In October, Rubidoux called Dr. Keihn to tell him they were not getting paid. Dr. Keihn told him to get leases signed. Dr. Keihn told him that he would make sure Claimants were paid. Subsequent to the telephone call to Dr. Keihn, Rubidoux sent a letter dated October 23, 1990, to Dr. Keihn. Subsequent to that letter, Keihn said Claimants would receive some money in the next week or so. They received a payment of $3,000 to $3,500 through Coach Johnson at the building the first week of November.

Claimants did not get any leases signed. The rent arrearage continued. Dr. Keihn told Claimants that by the end of January he would pay for all back rents and would pay for the rest of the year for these students. In January, Dr. Keihn said it would take 30 to 45 days to get Claimants paid. In February, Rubidoux had several conversations with Dr. Keihn. In March, Rubidoux told Dr. Keihn that between $10,000 to $12,000 was due. Keihn said that was not a problem, and told Rubidoux to meet Coach Johnson.

Claimants met with Coach Johnson in the first week of March. Johnson told them he was giving them $3,000 to $3,500, not the $10,000 to $12,000 owed. Rubidoux was "shocked" and "furious," and testified that Coach Johnson indicated that he thought that maybe we had been taken a little bit." According to Rubidoux, Johnson explained that he had found in his dealings that Dr. Keihn had not always been truthful or forthcoming.

Claimants called Dr. Keihn who invited them to his office. At this meeting, Claimants were told that the money was forthcoming. They never received it. However, Claimants received rent money from individual students, and had a manager who sometimes collected rent from the students.

Dr. Keihn told Claimants that the university would pay for damage done to apartments. Rubidoux believed that Claimants were owed $19,800 as of May, 1991; the typical cost of painting an apartment is $300 to $400.

At the end of the school year, Claimants found some of the apartments "totally destroyed," with holes in walls, toilets broken or missing, appliances destroyed, gouges in hardwood floors and worn carpeting. Rubidoux said repairs cost approximately $16,000.

Rubidoux still believed as late as August of 1991 that the university was going to continue to use the apartments. Claimants discussed the cost of repairs with Dr. Keihn, and explained that they did not have the capital to perform the repairs. Dr. Keihn said the university would stand behind the Claimants for the long-term commitment and would take care of them.

Claimants took out a second mortgage on their homes. Because of the rental season, the apartments were empty for the second year 1991-1992. Two of the apartments were rented in April or May of 1992. It took Claimants quite a while to fix the apartments.

On cross-examination, Rubidoux identified the apartments that were used by the student athletes as 2 South, 3 North and 3 South on the 4900 side, and 1 North and 2 South on the 4904 side. (Respondent's exhibit no. 1.) As of July 1990, all apartments were occupied with existing tenants. He explained how they worked with existing tenants

to open up the eight apartments. Claimants did not spend any money in excess of what is normally spent to prepare apartments.

Claimants received three payments from the coaches totalling $10,000 to $10,500 that were comprised of cash, cashier's checks and personal checks from students. No university checks were received. Rubidoux said he believed the money was coming out of the university budget, being paid first to the students and then given to the Claimants. Dr.Keihn told Claimants that the students would be responsible for the utilities.

Previously, Claimants had never rented to a tenant without a credit check and a signed lease, but neither occurred with the student athletes. Claimants' exhibit no. 6 refers to leases that were sent to Dr. Keihn, and indicates the leases have partial signatures. He indicated that maybe one or two students signed leases.

### Testimony of Wayne E. Silverman

Mr. Wayne E. Silverman, C.P.A., testified that he compiled the loss figures for Claimants, but did not opine to their efficacy. From information provided by Claimants, Silverman computed the losses (see Claimants' exhibit no. 8). Claimants' damages claim, according to Silverman, includes the following: (1) lost rent for September 1990 to August 1991, $20,167.69; (2) labor costs for repairs, $8,867.16; (3) material costs for repairs, $7,570.87; (4) rent losses for the following year through May 1992, $40,668.75; for a total of $113,927.12.

### Testimony of Richard Sasak

Richard Sasak testified that he is Mr. Rubidoux's partner. He stated that Claimants' exhibit no. 1, which is undated, was sent after Keihn's July 16 letter (Claimants' exhibit no. 2). He met with Dr. Keihn at the university in

February 1991. Keihn told him that Claimants would be paid in March for the past due amounts and for the balance of the year. Keihn called later and told him to meet with Rees Johnson and money would be paid to Claimants by Johnson.

Claimants received $3,000 to $3,300 from Johnson. In June or July 1991, Keihn told Claimants that Mr. Jonaitis, the purchasing agent, was going to set up a method to make sure they were paid by the university on time. Keihn told him that Jonaitis would take care of the past due sum of $19,800.

Sasak believed that Keihn had the authority to make the commitments on behalf of the university. No one ever stated that they were not speaking on behalf of the university.

Sasak met with Mr. Jonaitis in August 1991, and told him Claimants wanted: (i) back rent of $19,800; (ii) the university to make future payments directly to Claimants; (iii) to make only eight apartments available. Sasak found out he "was fully duped," when Jonaitis told him that he did not know what Sasak was talking about. Sasak handed him a copy of the August 1, 1990 letter and Jonaitis put his hand on his forehead and said "oh, my gosh," according to Sasak, who perceived Jonaitis to be "in total shock." His first comment was "Rich, I just wanted to tell you there is no slush fund in the university to cover this $20,000, to begin with." Jonaitis said he would check with Keihn and the president of the university. When Jonaitis contacted Sasak later, he said it was the university's position that it was not liable.

Claimants' apartments were not fixed and ready to be leased in October 1991, during the rental season in Chicago. He agreed to participate in attempting to get

leases signed at Keihn's request because he believed it would facilitate getting paid. On cross-examination, Sasak indicated that during the beginning of the rental season in the fall of 1991, he thought the university was still going to use the apartments.

### Testimony of Rees Johnson

Mr. Rees Johnson testified that he was the head coach of the men's basketball team at the university during the events of this case. He remembered meeting Claimants with Dr. Keihn in 1990. His recollection was that at the meeting, he was "like a mouse in a corner" and just listened. He does not remember the specifics of the conversation. He believes Keihn invited him to the meeting to let him know that a concern of Johnson's, housing for athletes, was being addressed. He never participated in locating housing for student athletes. Keihn always told him that the university was not going to get involved in housing, and that it would be left to the student athletes, but that Assistant Coach Knar would help them find places.

The scholarship athletes would receive a check from the university for living expenses, and those student athletes receiving financial aid would also receive checks. He remembers meeting with Claimants to give them some money. Keihn asked Johnson to "put a little pressure on" the student athletes that were behind in their rent to Claimants. He did so because Keihn told him that he wanted to be helpful to Claimants and to make the student athletes more responsible. Someone gave him a list of which students owed, and in what amounts. He talked with the athletes and collected as much money as he could. It was in the form of checks and cash, and although it was not the total owed, he gave it to Claimants.

Johnson did not have access to a budget or funds to pay Claimants, or for housing. On cross-examination, he

indicated that he had not seen Claimants' exhibit no. 4. He recognized the names of basketball players listed in that exhibit. At least nine of the players were on scholarship, probably partial scholarships. Each student was responsible for his living expenses. He did not recall Keihn saying that the Claimants' relationship was with the students.

Johnson acknowledged that Keihn did not keep promises to him on salary level and a reimbursement of expenses. At the March meeting when he gave Claimants the payments, he told them that he was not responsible and the responsibility was the students'. He "was never too fired up about" bringing the money to Claimants. He gave Claimants a paper that stated the amount collected from each student, but never met with Claimants after the March 1991 meeting.

### Testimony of Richard Knar, Jr.

Richard Knar, Jr. testified that he was the assistant men's basketball coach at the time in question. He helped find housing for student athletes. He did not meet Claimants until students were moving into the apartments in the fall of 1990. Keihn had previously informed him that Claimants' apartments would be available for student athletes. He prepared a list of students and sent it to Claimants. He did not recall ever giving Claimants any money for rent. He did not see Johnson give Claimants money for rent in the fall of 1990. Knar did not ever collect money from the student athletes for rent.

He saw leases signed by the athletes for their tenancy, but does not know what happened to them because he gave all documents to Keihn at his request. Keihn told him that the students were falling behind in their rent. Knar told the students they had to take care of the landlord. Keihn never told Knar that the university would pay

the rent. Keihn always told him that the university would not pay for apartments. He never noticed extensive damage to the apartments.

On cross examination, he acknowledged that he could not recall during his deposition whether he saw leases, but now he remembers two specific ones that he saw. He did not have any discussions with Claimants in regard to their relationship with the students. He remembers that when the students moved in he took them to the bank and then to the apartments where they paid the building manager and they received receipts. He never took the students to cash their checks again and never handled the money. Although he heard both Keihn and Johnson say that the relationship was between the landlords and students, he did not hear them say it to Claimants. Students would receive a room and board check.

### Testimony of Peter Wollstein

The evidence deposition of Peter Wollstein, Vice President of administrative officers of the university at the time of these events, was admitted. (Respondent's exhibit no. 6.)

Mr. Wollstein's office did not play a role in attempting to find student housing in the summer of 1990. Keihn told him that some people expressed interest in accommodating student athletes, but he never had any contact with Claimants. He understood that each student would enter into their own contractual relationship with Claimants. The university did not pay any money to Claimants. Keihn did not speak for the university at the time in terms of contracting. He did not recall having a conversation with Keihn about presenting a proposal to the Board of Governors. Keihn could not enter a contract on behalf of the university.

Testimony of Dennis Keihn

The evidence deposition of Dr. Dennis Keihn, athletic director of the university at the time of these events, was admitted. (Respondent's exhibit no. 7.) As of the date of the deposition, Keihn was no longer employed by the university.

Dr. Keihn was director of athletics during the relevant time. The university had not entered into any leases with landlords for student athletes. He remembered meeting Claimants in July 1990, and they discussed the possibility of renting to student athletes. Kiehn recalled that their discussions included such things as "that the athletes were to sign leases and the athletes were the ones that were going to be responsible for the payment of the rent." He told Claimants that the university was only trying to help the students locate housing and he did not indicate that the university was interested in entering some type of agreement.

Kiehn received the undated letter from Sasak, and then sent Claimants the July 16, 1990, letter in response. He discussed the Claimants' proposal with Vice President Wollstein because he wanted to make sure the university was not responsible. Wollstein did not state any objection to Keihn on the manner in which he was proceeding.

Keihn met several times with Claimants, and once with Johnson. He kept making "it plain to" Claimants that their arrangement was not with the university and that the student athletes were responsible. Although he "always made that very plain, even though they kept always trying to come back and trying to say that this is an agreement with the university and the athletic department," he never put it in writing.

Prior to sending the August 1, 1990, letter, he showed it to Wollstein and discussed it with him. He believes

Wollstein showed the letter to attorneys of the Board of Governors. He did not provide the security deposits or lists of students. He did receive calls from Claimants seeking rent, and he would tell them that he would talk to the coaches. He remembers Claimants sending some leases to the coaches. Claimant did not request that the rent be paid by the university. He constantly maintained that he was only acting to facilitate finding suitable housing, that university officials were kept abreast of events and he never made any statements to Claimants that would obligate the university in any way.

## Discussion

We have summarized the testimony in this case in more detail than is strictly necessary to our decision because it is highly disturbing in at least two respects: First, someone is plainly lying, as the Claimants' sworn versions of their dealings and conversations with Dr. Kiehn are irreconcilable with his sworn version of those dealings and conversations. Second, if Claimants' version is accepted, even partially, the conduct of Dr. Kiehn towards these landlords is utterly reprehensible. His conduct was especially egregious, given that he was an agent of a public university which, as part of the State, is clothed with sovereign immunity and is not as fully subject to the laws of liability in this Court as is a private institution or even a local government in the circuit court.

Although our commissioner believed, and this Court accepts as true, most of the testimony of the Claimants, particularly as to their conversations and dealings with Kiehn, and although this Court rejects most of Dr. Kiehn's testimony, the conversations and "representations" of Dr. Kiehn are only part of the relevant facts that determine our decision.

As we observed in our prior order on the exhaustion grounds, the threshhold issue in this case is the relationship (if any) between the Claimants and the university—and, concommitantly, the relationship (if any) between the Claimants and the university student-athletes. These issues, particularly the question of whether it was the university or the students who rented the apartments—and were thus the tenant(s) who had privity with the landlord/Claimants—are dispositive of the count I contract claim and are also dispositive of one aspect of the exhaustion issue which we have deferred until now. Because the exhaustion issue plays out somewhat differently on the different aspects of this claim, we turn first to that issue.

### The Exhaustion Issue

Claimants in this Court are required to exhaust all possible alternate sources of recovery for the damages or injury for which they seek recovery from the State. This rule is statutory and mandatory (section 25 of the Court of Claims Act; 705 ILCS 505/25) and is also implemented under section 790.60 of the Court of Claims Regulations. (74 Ill. Admin. Code 790.60.) This exhaustion of remedies requirement precludes recovery of an award by this Court until all other potential sources have been exhausted, and bars a claim for damages as to which recovery has not been sought.

In this case, it is admitted by the Claimants that they pursued no relief against the student-athletes who were (i) undisputedly the occupants of the apartments, and who were (ii) allegedly the cause of the physical damages to the premises (for which Claimants seek compensatory damages under each of their three counts), and who were (iii) arguably, but disputedly, the tenants of the apartments who were primarily liable for the rent. To the extent that Claimants had a potential claim against these

known individuals, they must exhaust their relief against them before recovering in this Court. To the extent that they have failed to exhaust, Claimants are precluded here; and if the alternative recovery against those potential defendants is now barred (e.g., by limitations), the claims are barred in this Court by our exhaustion requirement.

In this case, the physical damage claims are plainly barred by Claimants' failure to exhaust, as the damages to the premises by those persons would be a tort independent of their status as tenants, subtenants or otherwise. Having failed to pursue tort claims against the alleged perpetrators of physical destruction of their property, Claimants cannot prosecute such damage claims in this Court. (We note in passing that this conclusion assumes, but need not decide, that these Claimants would have a claim against the university for·these damages.)

With respect to the larger damages claims of unpaid rent, the exhaustion issue turns on the question of whether or not Claimants, as landlords, had an action against the student-athletes who occupied the various apartments. This turns on the relationships between the parties and the students, and ultimately on whether the students were the tenants and were in privity with the landlord so as to permit a suit against them, thus requiring the Claimants/landlord to exhaust as to them. On the other hand, if the university was the tenant, as the Claimants contend, then the students were subtenants or some other status which would not permit the Claimants/landlord to sue them, in which event exhaustion is not a bar.

We accordingly turn to the count I analysis of the alleged rental or guaranty agreement between the Claimants and·the university.

## Count I—The Contract Claim

Claimants contend that the letter agreement, dated August 1, 1990 (Claimants' exhibit no. 3), that was written and sent on university letterhead by Dr. Keihn, and that was countersigned as agreed by Claimant Sasak, was a contract between the university and Claimants. Claimants contend the contract thus created was either a rental agreement in which the university agreed to rent and pay for the eight apartments for two school years and the intervening summer, or was a guarantee agreement in which the university agreed to pay any shortfall in rent payments of the students.

The Respondent contends that the letter agreement, on its face, is not an agreement to rent or to guarantee any payments, that Dr. Keihn was not authorized to contract for the university, or to deal with student housing, that the agreement was not approved by the Board of Governors, as is statutorily required for university contracts, and that the agreement was not made in compliance with the State Purchasing Act.

We need not dwell long on this issue, as it is abundantly clear that the Sasak-Keihn letter agreement of August 1, 1990, does not purport to obligate the university to pay rent or to guarantee students' rent, and clearly fails to comply with State and university requirements for a contract. In particular, the absence of corporate approval by the Board of Governors and the absence of lawfully delegated contracting authority in Dr. Keihn—neither of which are shown and both of which are burdens of the Claimant—preclude finding a binding contract.

We must also reject Claimants' "apparent authority" contention as to Dr. Keihn. First, that doctrine has limited, if any, application to the State, where contractors are

required to ascertain at their peril the true authority of purported agents of the State. (*Dunteman v. State* (1985), 38 Ill. Ct. Cl. 51; *Bellini v. State* (1982), 38 Ill. Ct. Cl. 701.) As this Court has pointed out, when dealing with the State, one cannot do so on a handshake. (*New Life Development Corp. v. State* (1965), 45 Ill. Ct. Cl. 65.) Second, the facts here do not bear out a good faith reliance on Keihn's "authority" which was blatantly ineffective to produce rent or documentation early in the dealings between them.

Finally, we note some of the aspects of the parties' agreement and course of conduct of this student housing debacle that not only fail to support Claimants' contract theory of the case, but pretty well refute it.

First is the fact that the so-called agreement states that: "Each athlete will be paying for their share of the rent, etc." (Claimants' exhibit no. 3, p. 2). This is inconsistent with the notion of the university as tenant. Moreover, in this context, the absence of at least a nominally clear undertaking for the university to pay *something* is almost dispositive. Second, the students, or at least some of them, paid rent at least some of the time. Third, someone prepared leases for the students, which although not fully executed, shows an understanding as to who were the liable tenants, particularly in the absence of any evidence of any objection or protest by the student-athletes. Fourth, there is no showing of any university payment to the Claimants; the only payments that were made by university personnel were made by coaches, not through regular university fiscal officers and not by university check; those payments included cash, which derived at least in part from the students. Fifth, the fact that university coaches were paying student-athletes' rent in cash was then, or should have been, an alarm bell for the Claimants as it now is for this Court.

With our conclusion that the university was not the renter or the tenant of the Claimants' apartment, it necessarily follows that the student-athletes who occupied the premises and who were paying, or were supposed to pay, the rent were the Claimants' tenants as a matter of fact and as a matter of law. In the absence of written leases, it is likely that the legal result was a month to month tenancy. That is nonetheless a tenancy, with privity, and supports a landlord's right to sue for unpaid rent, which thus triggers this Court's exhaustion requirement.

Accordingly, count I must be dismissed for failure to state a contract claim and as barred by Claimant's failure to exhaust their alternative remedies against the student-athlete-tenants.

### Count II—Implied Contract

Insofar as count II seeks damages for unpaid rent and for physical damage to the premises, it is barred by Claimants' failure to exhaust their alternative remedies against the student-athletes, for the reasons discussed above.

However, insofar as count II seeks damages for unpaid rent, *i.e.*, for the second school year of the alleged arrangement between the Claimants and the university (through Dr. Keihn), we would be obliged to consider it on the merits, except that we lack jurisdiction to entertain an "implied contract" claim. This Court has rejected implied contract claims, including *quantum meruit* actions, because our "contract claim" jurisdiction under section 8(b) of the Court of Claims Act (705 ILCS 5/8(b)) is limited to actual, express contracts "entered into" by the State, usually with the Claimant but sometimes with another when the Claimant is a third-party beneficiary. (*See, e.g., Haendel v. Northern Illinois University* (1996), 50 Ill. Ct. Cl. 224 (No. 90-CC-0234); *Brighton Building*

*Maintenance Co. v. State* (1982), 36 Ill. Ct. Cl. 36.) Accordingly, we must dismiss count II for want of jurisdiction.

### Count III—Misrepresentation

The unpaid rent and physical damages aspects of this claim are barred by the Claimants' failure to exhaust their alternative remedies, for the same reasons set forth above with respect to counts I and II. However, we take up the second-year rent claim as to which there were no alternative sources of recovery (i.e., no student occupants or lessees) to exhaust.

This claim too must be rejected, notwithstanding the egregious conduct of Dr. Keihn, who seems surely to have misled the Claimants and, arguably, to have outright lied to them (although it is also obvious that Claimants behaved naively, if not worse).

Aside from the nettlesome issue of whether Dr. Keihn in his athletic department capacity was in a position with any real or apparent university authority to make representations as to student housing—which is pertinent to any claim of reliance on his representations—we find that Claimants have not proven any factual misrepresentation that might be actionable. Although Keihn may have been untruthful, his statements were not matters of fact, but promises or predictions of the university's future conduct—e.g., promises or representations of future payment—or of the university's future position on these apartments. In effect, the charge is that Keihn misled the Claimants that they had a binding contract—a legal conclusion—and would get paid—a future act—when he knew that was not, or would not be, the case.

But predictions, promises and representations of future events, as distinguished from existing *facts*, are simply

not actionable as a misrepresentation. (*Ziskin v. Thrall Car Manufacturing Co.* (1st Dist. 1982), 106 Ill. App. 3d 482, 435 N.E.2d 1227, 62 Ill. Dec. 255; *Younger v. Revelle* (5th Dist. 1979), 78 Ill. App. 3d 1, 397 N.E.2d 221, 33 Ill. Dec. 888; *Peterson Industries, Inc. v. Lake View Trust and Savings Bank* (7th Cir. 1978), 584 F.2d 166.) Predictions of future business, which is analogous to the second-year rent "representation" here, are not actionable as misrepresentation or fraud. *Barrington Press, Inc. v. Morey* (7th Cir. 1985), 752 F.2d 307, citing *Pustelniak v. Williams* (1933), 352 Ill. 270, 275, 185 N.E. 611.

## Conclusion

For the reasons set forth above, this claim must be denied in its entirety. This claim is denied and forever barred.